# DECISIONS

OF THE

# SUPREME COURT OF THE STATE OF TEXAS.

## AT DECEMBER TERM, 1847.[1]

SAM. HOUSTON, PRESIDENT, ETC., VS. THE ADMINISTRATOR OF
STERLING C. ROBERTSON — Appeal from Travis County.

The declaration contained in the statute, that the contracts of empresarios
ceased to exist on the day of the declaration of independence, did not render
the government of Texas responsible to any empresario for any future loss
or damages he may have sustained thereby. [15 Tex. 577.]

The act of the consultation closing the land offices did not preclude the empre-
sarios from inducing families to emigrate, for the purpose of settlement in
their colonies, after the reopening of the offices, and they are entitled to
the premium for the families introduced by them within the general limits
of the country, prior to the declaration of independence.

The fact of the agency of the empresario in thus introducing families into the
country, after the closing of the land offices, and before the declaration of
independence, is material, and must be submitted to the determination of
a jury.

The power of interpreting the laws, and determining their conformity with
the constitution, was an attribute of the legislative and not of the judicial
department of the state of Coahuila and Texas.

Sterling C. Robertson, claiming to be the empresario of the
colony known as the Nashville or Robertson's colony, filed his
petition in the district court in November, 1837, praying that
his claims and rights as such empresario might be settled and
confirmed, etc. At the spring term, 1841, there was a verdict
and judgment rendered, confirming the right of the petitioner,
or empresario aforesaid, to thirty leagues and thirty labors of
land.

---

[1] Eight of the cases decided at this term are reported in the first volume of
Texas Reports, commencing at page 669, and in consequence are not em-
braced in this.

(1)

[2] The most material facts of this case will be found stated or adverted to in the opinion of the court.

*Harris*, Attorney General, for appellant.

The late republic, being sovereign, could not be sued without its consent. This consent was never given, because the act of the 12th of June, 1837, under which these proceedings purport to have been commenced, was not passed in the manner required by the constitution. See section 26, 1st article Constitution of the Republic; 4 Hill, 384, 402, 404; Journal House of Representatives, 131; Journal Senate, Constitution, sections 11–17. The bill was vetoed, and afterwards not passed by a constitutional majority. The journals do not show what was the action of the house, in compliance with the provisions of the constitution.

The documents accompanying the plaintiff's petition, even if correctly translated, show no intention on the part of the government of Coahuila and Texas to take the contract from the Nashville company and confer it on the petitioner, as he alleges. *Vide* exhibit E. Such an intention cannot be presumed. It must be plainly shown. Constitution of Coahuila and Texas, art. 170; Constitution of Mexico, art. 19; 1 White, 378.

The declared basis upon which the contract was extended was that one hundred families had been introduced in time to save the rights of the company under the old or original contract, as evidenced by the proceedings of the ayuntamiento. Exhibits C and E.

The petitioner must recover, if at all, on the case presented by his petition, which is that he is entitled, in his own right, to all the interest in this contract, and that the government divested the Nashville company of their rights under it and conferred them upon him. Yet no contract to that effect seems to have been made and signed as in the other instance. Deny this position, and the republic will have to respond to Robertson, to the Nashville company, and to Austin and [3] Williams. The decree of the congress of Coahuila and Texas which favored Robertson was subsequently revoked. See dec. 317, Laws of Coahuila and Texas. Robertson's

claim, then, stands on no stronger or higher ground than that of the Nashville company, or of Austin and Williams, and if his be sustained theirs should be equally so. For if the government of Coahuila and Texas could not annul Robertson's, it would be equally without power to annul that of the others.

The whole of the evidence upon the trial, except that furnished by the commissioner of the general land office, to show the premium lands of Robertson, was inadmissible. All that part of the evidence which related to a partial compliance with the contract was inadmissible, because some of it was hearsay, and the most of it secondary evidence, and because there was, in the petition, no allegation of any such partial compliance. The verdict of the jury was therefore not warranted by the testimony, and was irresponsive to the issue.

The law of Coahuila and Texas required a registry of the colonists. This ought to have been produced, or its absence accounted for. The verdict was bad, also, because it was excessive, being rendered for more, by ten leagues, than he could, under any state of facts, recover under his petition.

The petition itself is, in every point of view, informal, uncertain and insufficient.

If this be a suit *at law*, for the recovery of land, it was incumbent on the petitioner to designate the lands which he claimed. If, on the other hand, it be construed to be a suit *in equity*, for the specific performance of a contract, it would be without a precedent, if he could enforce it against one that was no party to it, when, too, on his own part, there were many *precedent conditions*, every one of which he had failed to perform.

The public domain belonged to the federal Mexican government. [4] The state governments acted only as its agents in colonizing lands within their respective limits. To a contract for colonization, then, the parties were the federal government and the empresario. In all such contracts there were conditions imposed upon the empresario, and they were *conditions precedent*. His right to premium lands depended upon his having first introduced the families stipulated in his

contract. Conditions precedent must be literally and punctually performed, before the estate dependent upon their performance can vest. 2 Dall. 317.

Texas was no party to the contract, and should not be substituted and made to answer to it because she prevented its performance. Laws Coahuila and Texas, p. 301.

The consent of the government to the institution of the present suit is claimed to have been given by the 27th section of the general land law. That section enacts, "that in order to settle the claims of empresarios, each and every one of them are hereby authorized to institute a suit against the president of the republic of Texas, which said suit or suits shall be tried as all other land suits are required to be tried. *Provided*, that neither aliens, nor the assignees of aliens, shall be entitled to the benefits of this act." It is clear that the petitioner, in claiming the benefit of this act, must conform strictly to its provisions. His suit must be tried "as all other land suits are required to be tried." Now, in every other land suit the petitioner or plaintiff has to designate particularly the lands for which he sues, and must recover by the strength of his right or title. In this instance the plaintiff has not even pretended to designate or describe a *single tract*, or an acre of land in his petition, which surely was essential if his suit was to be tried as all other land suits were required to be tried.

Again, the benefits of the act were not to extend to aliens, or the assignees of aliens. Now, the petition shows that the members of the Nashville company were aliens. The petitioner, in an exhibit accompanying his petition, is represented [5] as a member and the agent of the said company. It is evident that he claims this as an extension of the contract made with that company. His petition shows that their partial compliance saved the contract from forfeiture, and that he acted as their agent until he could establish the fact that a contract was subsequently made with himself, as principal, and this we contend he has never established. Even if he were recognized as empresario, the presumption is that he still continued to act as the agent of the same company, and that he sued in this capacity. This view receives strength from

the fact that he concedes to them no benefit from their partial performance of the contract, and surely he would not sue to recover, in his own right, the premium leagues to which the company were justly entitled for having introduced the first one hundred families. If this view be correct, then he has sued as an agent for the benefit of aliens, in direct violation of the act under which his suit was instituted.

It appears from the record and the laws that this colony was first granted to the Nashville company. Before the expiration of that contract, it was granted to Austin and Williams. This last was declared as revoked by the law, and the first contract was declared to be extended. Before the expiration of the extended term, this was declared to be revoked in favor of Austin and Williams. Now, it is evident that the legislature of Coahuila and Texas either could or could not revoke such a contract. If they could do so, then they revoked the first contract with the company in favor of Austin and Williams, and subsequently revoked the extended contract in favor of the same individuals; and under this view the petitioner cannot recover. Suppose, on the other hand, the legislature could not revoke such a contract; then they could neither annul that of the Nashville company nor the first contract with Austin and Williams, in favor of the petitioner; and under this view of the subject he cannot recover.

It was decided in the Florida cases, that, in order to enforce a grant, the land must have been severed from the public [6] domain, either by a survey or by a descriptive grant. Smith v. United States, 10 Peters, 331. The right to land must have a local habitation. 10 Peters, 233; id. 336.

The cases of the United States v. Sibbald, and United States v. Arredondo, cannot be assimilated to the one at bar. The first was a case of *grant;* this, of *contract.* There the lands were designated and severed from the public domain; here they were not. There no time was limited in the grant for the performance of the condition; here the time was limited. There the court determined that under the treaty and the act of congress, he had shown the performance of such acts as

amounted to a compliance with the condition; here there was no such compliance.

In the Arredondo case a deed for the land was executed; here there was merely a contract. That was a grant upon a condition *subsequent;* this a *contract* upon a condition *precedent.* There the land was designated and severed from the public domain, and had become private property; here such was not the case. There the title had passed; here it had not. There the party was prevented from performing the condition by the party with whom he had contracted; here he was prevented, if he ever intended to perform it at all, by a third party with whom he had not contracted, and whom he had never trusted.

It will be seen by a reference to the 8th section of the colonization law of 1825, that any person whomsoever might obtain an empresario contract without paying the slightest consideration for it, and that it was completely at the option of the empresario to comply with the conditions of his contract, or to fail to do so, and that to such failure not the slightest penalty whatever was annexed. Then, under the present contract, which was made in strict compliance with this section of the law, as the petitioner was not *bound* to introduce or settle the families, the government was not bound to permit him to introduce them. If he had the right to terminate the contract at any period of time, by refusing [7] farther to comply with its conditions, the government had the same right, at any period of time, to terminate the contract on its part, by refusing to permit him to introduce and settle the families under it. For, in every contract, the parties must be *mutually* bound, or neither will be bound by it. Indeed, the contract was one *sui generis.* It was based upon no consideration, and might be terminated at any time by either of the contracting parties, without incurring any penalty; the empresario having the right only to claim remuneration in proportion to his compliance with it.

The government of Coahuila and Texas, in the exercise of a right which it possessed relative to such contracts, revoked

the one under consideration (see decree 317, Laws C. & T.) and the republic of Texas, succeeding to the rights and powers of the former government, also declared the contract to be at an end.

*Gillespie*, for appellant.

There was a good and valid contract existing between the appellee and the Mexican government, obligatory on both as is fully shown by the record. The fact of the government of Coahuila and Texas being a party to the contract does not render it the less binding upon either. Contracts between the sovereign authorities of a country and private individuals are as well protected and enforced as those between individuals alone. 4 Peters, 514; 1 U. S. Cond. 453; Vattel, book 1, ch. 1. The Mexican government held forth to the world the conditions on which she would dispose of her territory, and when accepted must be interpreted and enforced as other contracts. 1 U. S. Cond. 452.

This, then, being a contract with the Mexican government, obligatory on both parties, the republic of Texas, which derived the benefits thereof, is bound to fulfill the same on her part. By the revolution, the dominion and sovereignty of the territory, in which we claim our land, fell [8] to Texas, and it is to her alone we can look for recompense. A vested right cannot be impaired or invalidated by a change or revolution in a government. The political action and form of government may undergo a change, and by this change the mode or means of enforcing the right may be different, yet the right itself still exists. Nor does a cession or conquest of territory affect the right of property. 7 Peters, 711; Puffendorf, lib. 8, ch. 12, sec. 12; 9 Peters, 117; 2 White, 494; Vattel, book 3, ch. 18, p. 200; 12 Peters, 410 to 436; 4 Peters, 512; 1 Cond. 446; 7 Peters, 86; 1 Kent, 24; 10 Peters, 330; 6 Peters, 88; 8 Peters, 718.

The appellee insists that he has done all in his power towards the strict and literal compliance of the contract on his part, and if the same was not completed, it was because the other contracting party prevented him, and his rights should not thereby be affected. Puffendorf, 307; Douglass, 694;

1 Term, 645; 1 East, 203; 2 Salk. 633; 1 Bacon, 680; 4 Dallas, 199, 203; 3 Cranch, 1, 65; 1 Pothier, 100. If the performance of the conditions be dispensed with by the grantor, or prevented by him or the enemies of the country, the grant becomes single. 6 Peters, 746; 1 U. S. Cond. 453. Or if, by the change of government, the condition of the parties be altered, the conditions were not enforced, and the grant becomes single. 6 Peters, 745. If there should be any doubt as to this doctrine at law, equity, to which we have applied, will relax the rigid rules of law, and enforce a right, if there has been a *cy pres* compliance; there being subsequent conditions and interest vested which can only be divested by a failure to show an equitable compliance.

The evidence clearly shows that Robertson had done much towards the completion of the contract, and there can be no doubt, from the testimony, but that the revolution and decree of the consultation prevented its completion, and thereby dispensed with the conditions. Arredondo's case, 6 Peters, 746; 1 U. S. Cond. 453; 12 Peters, 323; id., [9] 436–440. Our claim is specific; the boundaries as much so as in the Arredondo case. The contract in that case was on condition of settling two hundred families in certain boundaries, leaving him to make his own contract with the settlers; in ours the law makes the contract, but he, as well as Robertson, was empresario, and when he was prevented from complying with his contract the whole benefit of the same inured to him.

Our contract is private property; although imperfect and inchoate, it was an equitable claim and demand, first against the former government, and now against this, and should be held equally sacred by the laws and usages of civilized nations. 1 White, 712; Soulard's case, 4 Peters; Perchman's case, 7 Peters; Rutherford v. Gen. Green's Heirs, 2 Wheat.; Sim's Lessee v. Irvine, 1 U. S. Cond. 198.

*John B. Jones*, on the same side.

Was there such a colony known in this country as "*Robertson's Colony?*" The record in this cause, the public records of the country, the legislation of congress, the acts of the governor, and, as much as anything else, the public and common

history of the country, all answer in the affirmative. Who was the empresario of that colony? There can be no doubt that Robertson himself was. He introduced the families; the government styles him empresario, and recognized him as such; congress legislates for his benefit as such; the governor contracts with him as such; his contract is prolonged; grants are made to him of premium lands as empresario; grants are made to his colonists as such; a commissioner is appointed for the colony at his instance. It is, in short, a public and notorious fact, as much so almost as any other in the common history of the country. Much that might otherwise have been shown on this, as well as other points in this cause, has been lost to us by the archives of the state remaining with the enemy at Monclova, after the [10] revolution, and for the absence of which due allowance will be made.

This contract was for the introduction of 800 families, being the largest number for the introduction of which the empresario could, under the twelfth article, Col. L., receive the corresponding premiums. Contracts like this were authorized not only by the general policy of the government, but by express legislation. See article 8, Col. L. The rights of the empresario, and his compensation, were made to depend as well upon positive law as upon the stipulation in the contract made by the governor. Arts. 8 to 12, Col. L. The law contemplated a contract, and the law itself formed a part of that contract.

What effect did the revolution have upon this contract? Abundant authority has been referred to by my colleague to show that a change of government does not work a change in private rights. The new government succeeds to all the rights, and incurs all the liabilities of the old. 1 Kent, 25. The people of Texas did not regard the change of government as working a destruction of individual rights. And though by article 14 they *suspend* the operations of the several land offices, yet in the next article, 15, they secure to all persons the benefit of the colonization laws under which they emigrated. The convention, too, of which Robertson was a member, avow the same principles, and the congress, in the very act by which

we are enabled to sue, recognize the rights of empresarios. By suspending the operations of the land office, the government did not impair, in any respect, the rights and benefits accruing to the empresario under his contract; the question is referred to the courts that they may declare the law of the contract under the circumstances with which it is connected. And the question presented in this case is, whether the empresario, having so far performed his contract as shown by the facts, and having been prevented from a *full* performance by the action of the government itself, is not entitled to the full amount of [11] premium lands to which he would have been entitled had he been permitted to go on and fully complete his contract? In addition to the authorities already cited on this subject, see Powell on Contracts, 417 to 421; 1 Nott & McCord, 284; 2 Con. R. S. C. 404.

In regard to the constitutionality of the law under which we sue, it is sufficient to say that this law comes to us from that department of the government whose peculiar province it is to pass laws, *sanctioned and verified* by the certificate and signature of the presiding officer of each house of congress, behind which the court will not look. If this court could or would look behind these sanctions of verity, and hear testimony, and inquire whether, in fact, the act was passed without the requisite majority of each house, it would be difficult to imagine the many collateral, and even *ridiculous* issues they would, under the same rule, be called upon to try. Besides, this act has been recognized by numerous subsequent acts.

The objection taken in this court, for the first time, to the legal sufficiency of the petition is unsound. If valid, it should have been made in the court below. The party, by putting the facts in issue, thereby admits the legal sufficiency of the petition. This proceeding, though somewhat analogous to a bill for specific performance, is yet in many respects unlike that of any other proceeding known in common practice. It is simply a proceeding under the *statute* to settle the rights of an empresario.

The record admits that Robertson was the empresario. The

evidence shows that he introduced all the families; that he performed every thing that was done towards carrying out the contract. The decree 285, page 275, Laws of Coahuila and Texas, by authority of which the term of his contract was prolonged, recognizes the previous existence of a contract with him, and also admits the fact that before the law of the 6th of April, 1830, he had introduced families at his own expense. The governor, who alone could make [12] contracts, acting upon this matter with *full information*, extends the contract to Robertson.

As to the nature and extent of any contract that may have been made with Austin and Williams, we have nothing in the record to inform us, except what the governor has said upon the subject. Its existence depends upon mere inference. The governor declares that it *"was merely conditional, and could not be otherwise."* The decree 317, page 305, Laws of C. and T., could not, from its very terms, give any right to Austin and Williams until action was taken thereon by the governor, and accepted by them. There is nothing to show that any action was taken by the governor, or that Austin and Williams ever *accepted*, or that they were even willing to accept of a contract under it. It is very evident that Robertson was not interrupted in the prosecution of his enterprise by that decree. The revolution found him in the possession of his colony, engaged with energy and success in the rapid fulfillment of his contract. He had introduced three-fourths of the number of families specified in his contract, and, from every indication, would have completed the whole number long before the expiration of the time allowed him, had he not been prevented by the action of the government.

We think, then, there can be no doubt that the legal right to the premium lands is in Robertson, the empresario of the colony. The Mexican authorities so understood it when they issued titles for a portion of those same premium lands to him as such. And it can make no difference in the adjudication of this cause whether Robertson did or did not receive assistance from others in the prosecution of this enterprise. The government looked to him for the success of the project;

he alone is authorized by the statute to bring suit, and a recovery by him in this suit will bar all others.

Mr. Chief Justice HEMPHILL delivered the opinion of the court.

[13] The petitioner claims to have been empresario of the colony, known by the name of the Nashville or Robertson's colony, and gives a historical narration of the contract from its inception in 1825, in the name of Robert Leftwitch, its subsequent transfer to the Nashville company in 1827, to its prolongation for four years in 1834, in the name of the petitioner, as is alleged.

The contract was originally for six years, and expired by its own limitation in April, 1831.

From the exhibits appended to the petition, it appears that the territory within the limits of this contract had been, in February, 1831, assigned to Austin and Williams, as empresarios, for the purposes of colonization.

That, in consequence of representations made by the petitioner to the government of Coahuila and Texas, supported by documents (the contents of all of which are unknown as copies are exhibited), the contract of Austin and Williams, on the 29th April, 1834, was anulled so far as it embraced the lands within the limits of this colony; and it was declared that the families introduced by the petitioner before the 6th April, 1830 should, and ought to be established in said colony; and by decree No. 285 of the same date, the term of his contract was prolonged for four years. From the decree, it would appear that the contract was extended in the name or for the benefit of the petitioner. It is treated as his contract. The families introduced before the 6th April, 1830, are described as coming in at his expense, and a concession of the corresponding premium is directed to be made to him; and as his right to sue in the character of empresario has been strenuously opposed, we may say at once, that by the terms of the law under which he acted, he is treated as empresario, and regarded the government agent for carrying out the project of colonization.

We will not enter into a detailed statement of the matter shown by the record, but proceed to the examination of the [14] statute authorizing the action, and such questions as are presented by the facts and the exceptions, and as arise out of the laws, general or special, by which the contract was controlled or affected.

The suit was commenced before the passage of the land law of the 14th December, 1837, and was brought by authority of the act supplementary to an act to establish a general land office for the republic of Texas, p. 263, 1 vol. Laws. The question of the constitutionality of the law of the 11th December, 1837, is not involved in the case, and its discussion may be waived.

The fifth section of the law under which the suit is instituted declares that all " empresario contracts having ceased on the day of the declaration of independence, all the vacant lands of Texas are the property of the republic, and subject alone to the disposition of the government of the same."

The section 8th of the law is expressed as follows: " In order to settle the claims of empresarios, each and every one of the same are hereby authorized to institute a suit against the president of the republic of Texas, and his successors in office, which suit or suits shall be tried in the county in which is situated the seat of government of the republic of Texas, and shall be tried as all other land suits are required by law to be tried; and should any empresario, who should thus sue, fail to establish the claim for which he sues, he shall pay all the costs of such suit; provided, that neither aliens nor the assignees of aliens shall be entitled to the benefit of this act."

The sections 26 and 27 of the land law of December 14, 1837, p. 71, 2 vol. Laws, are literal copies of the sections above quoted, with an immaterial omission; and the authority to sue being thus in effect reaffirmed by the latter statute, no question can arise as to the effect of the repeal of a law, authorizing suit against the government, being made after the suit was commenced.

There is but one rule laid down in the statute to guide [15] our procedure and decision in the trial of these interest-

ing and important causes, and that is, to try them " as all other land suits are required by law to be tried." It is to be regretted that this rule is of so vague and enigmatical a character, as scarcely to be susceptible of any definite fixed, meaning; prescribing but very dimly any principles to guide our action, and the true interpretation of which, after all the elucidation it has received from the elaborate arguments of counsel, is still obscure and doubtful.

It cannot be supposed that the principles and rules which govern in actions of ejectment should control suits of this character, or that such as are peculiar to suits for specific performance can, as was contended, be enforced as applicable to this action. This is a class of suits *sui generis*, and the facts to be established and the rules to direct the judgment of the court should have been more specially prescribed.

The rights of the petitioner, however, as against the government, having been submitted to judicial cognizance, it becomes our duty, where no special intelligible rules are prescribed for our action, to adjudicate them according to the provisions and principles of such laws or systems of laws and such rules of equity as are applicable to the questions in litigation, so that the rights arising under the contracts with former governments may be secured, so far as they can be, in compatibility with the laws of nations, and the affirmative action of the republic of Texas in relation to the subject matter.

The contract in this case being treated in the lower court as one of undoubted validity, under the laws of Coahuila and Texas, up to the declaration of independence, we will first consider the principles by which actions on contracts, not impeached by the acts of the former government, must be determined.

The statute authorizing this suit to be brought declares that all empresario contracts ceased on the day of the declaration of independence, and that the vacant lands of Texas [16] are the property of the republic, and subject alone to the disposition of the same.

This was but the enunciating of facts arising out of the established rules of the laws of nations, regulating the rights

of conquest or successful revolution. On the disruption of the ties between the people of Texas and the republic of Mexico, and the formation of the republic of Texas, all the territory within the national limits passed under the control of the new sovereignty, and became subject to its disposition. Such portions as had been previously separated from the public domain, and vested by perfect title in individuals, would not, as an ordinary incident of revolutions, be disturbed. A general annihilation of private rights, even in a country overwhelmed by foreign conquest, would be regarded as an outrage upon the usages of modern warfare; but when a constituent portion of a state or kingdom declares and maintains its separate existence and independence, the security of all just and valid titles to property in which the great mass of the people, the originators and supporters of the revolution, are deeply interested, would, instead of being disregarded, be felt as an object of vital concern, and should be shielded by the most effective guaranties. Not only the lives and liberties, but the property of the people of Texas, were threatened with extinction by a remorseless foe; and while the great object of the revolution was to secure, on a firm basis, the blessings of political freedom, this could be and was accomplished without a general destruction of the vested rights of property, and without a general repudiation of the political obligation to discharge and complete such claims and rights arising under the old government as were inchoate, and still existed in contract, and were not incompatible with the policy, resources and purposes of the new government.

But, as in periods of war, and under pressing emergencies, it becomes necessary to devote public and even private property to the security of the state, or to contract obligations [17] under the express or implied pledge of the public faith, that the public resources shall be applied to their discharge, and as it is the primary duty of governments to provide for the safety and welfare of the governed, so, to answer these great purposes, it frequently becomes essential to treat the arrangements of the former government for the disposition of public property as nullities, and to discharge only such ancient

claims and recognize such previous rights, as will not seriously impair the powers of the new government in accomplishing the beneficial ends of its institution.

At a very early stage of the revolution it became apparent that the public lands constituted the principal resource for sustaining the government and invigorating the prosecution of the war.

In the declaration of the people of Texas, assembled in consultation, the system of appropriating portions of the public domain for military services had its origin; as those who volunteered were solemnly assured that their services would be rewarded by donations of land.

In the eighteenth article of the plan and powers of the provisional government, all grants, sales and conveyances of lands, illegally or fraudulently made by the legislature of the state of Coahuila and Texas, are solemnly declared null and void.

By the fifth section of an ordinance and decree to raise a regular army, every non-commissioned officer and private of the regular army shall receive six hundred and forty acres of land, on receiving an honorable discharge.

The like provision was made, by a subsequent decree, in favor of volunteers.

By the third section of the decree authorizing the governor to give instructions, etc., page 52, the commissioners were authorized to pledge and hypothecate the public lands in payment of a loan which they were instructed to effect.

And by a decree, page 78, of ordinances and decrees, one mile square was granted to the heirs and legal representatives of volunteers [18] dying in battle, or from sickness while engaged in the service.

By an ordinance of the convention which framed the constitution, bounty and headright lands were assured to all who would engage in the service of the country, and by the constitution a portion of land was secured to every citizen of the republic: to heads of families a league and labor, and to single men one-third of a league of land; and a general land office was to be established, where the land titles of the repub-

lic were to be registered, and the whole of its territory was directed to be sectionized.

Under such provisions as these, originating in the necessities and sanctioned by the good faith of the country, the government could not be required to recognize any arrangements of the former sovereignty for the distribution of the public domain which would interfere with the discharge of its own obligations.

The duration of the struggle was uncertain, and the amount of the public domain which would be absorbed in its support could not be ascertained; and to have permitted the most fertile and valuable portions of the public lands to continue fettered with the shackles of colonial contracts, inaccessible to the soldier and to the public creditors, or even to the citizens whose claims were secured by the constitution, unless permitted by empresarios to be received as colonists, and to have suffered the lands, to the neglect of all these claims, to be distributed to emigrants to the colony, who might arrive years after the declaration of independence, would evince a degree of complaisance to the engagements of the extinguished government incompatible with the justice, the sound policy, and the most sacred obligations of the new sovereignty.

To hold that all the contracts of a former government impose an inviolable obligation upon the new might inflict intolerable burdens upon the latter, and would make revolution [19] itself but a change of masters without the power of reforming even existing abuses.

If the government of Mexico had pledged to the deceased in payment of a loan for the support of the government, in the province of Texas, a portion of the revenue arising from imports at the port of Galveston for a certain number of years; or such a sum annually out of the direct taxes; or if she had made a special grant of the privilege of growing and selling tobacco for a consideration, a portion of which had been paid, and the remainder was to be discharged in annual sums for the support of the government, there is no principle of the laws of nations which would require the new government to adopt these arrangements or assume such burthens, injurious

as they would be, and perhaps ruinous to her welfare; nor, in fact, any other arrangements still existing in contract, the enforcement of which would contravene the policy and be detrimental to the essential interests of the new society.

But these undertakings for colonization, although denominated contracts, were always guarded by the government of Mexico and of the state of Coahuila and Texas as instruments of public policy, and as such, under the control of the sovereign authorities of the country, to be completed or suspended as comported with the interests, the public good, and the order and tranquillity of the nation.

By the 11th article of the law of the 6th of April, 1830, all the contracts which were to be colonized by North Americans were suspended, and the contracts which expired during the suspension were treated by the government of Coahuila and Texas as having no further existence, and the lands as vacant.

Even as contracts in the legal import of the term, they are not binding on the new government; and as instruments of public policy, as a part of the machinery of the former government, they can have no claim to recognition unless adapted to the ends of the existing government, of which [20] adaptation the government itself must be the sole arbiter.

Were all the contracts and incumbrances of former governments to be recognized, then, in proportion to the multiplication of these bonds, would be the hopelessness of any substantial benefits from change or revolution.

It was, perhaps, not necessary to a determination of the question under discussion to have ascertained at what period, by the laws of nations, these contracts became inoperative, and without standing, with the authorities of the country. That problem is solved by the declaration in the statute under which the suits are brought, that these contracts ceased to exist at the date of the declaration of independence. The consent of the government to be sued is given on terms. She had the right and power to determine what questions should be decided and the rules which should govern the decisions. All inquiry then is precluded by the declaration in the statute as to the legal existence or validity of these contracts after the

commencement of the revolution. Stricken from existence, as one of the necessary results of the revolution, and as in effect declared by the statute, they were incapable afterwards of originating any rights, duties or obligations affecting either the empresarios or the government.

The question, then, of whether the government is responsible to the party for the future loss occasioned by such abrogation of the contract, cannot be entertained. The statement that the contract ceased at the date of the declaration of independence is not to be taken as an arbitrary assumption of power for the consequences of which the government was to be responsible, but as a fact necessarily arising out of the circumstances of the revolution. The government does not ordain that they shall be void, or treat them as if any act on her part was necessary to their avoidance, but considers them as nullities from the inception of the revolution, and, by authorizing suit, she could no more intend to make herself liable for the continuing damages resulting from this annihilation [21] of the contracts, than for the inevitable losses inflicted by the struggle upon almost every individual in the country.

The inquiry, then, into the amount of benefit which the party might have obtained from his contract had no change of government intervened, being precluded from and after the date of the declaration of independence, we are next to examine into the rights which the party could claim up to that date, when the contract had not expired, or been suspended or annulled by the former government of the country.

There can be no doubt of his being entitled to the premium lands for the number of colonists to whom titles had been issued, nor for those received and admitted as colonists, but to whom titles were not made in consequence of the closing of the land offices of the country; but the legislature, by submitting these causes to judical cognizance, must have intended some further benefit to the empresario. Had this been the amount of compensation to be awarded, it could, without incumbering the dockets of the courts, have been ascertained by a slight investigation in the general land office.

As it is obvious that congress did not intend to restrict the

inquiry into the number of families actually introduced before the closing of the land offices, and as, from the suspension of the land system by the consultation, empresarios could not possibly infer the subsequent extinguishment of their contracts by the revolution, we are of opinion that the act closing the land offices did not actually preclude empresarios from inducing families to emigrate, for the purpose of settlement in their colonies after the reopening of their offices, and that they are entitled, as was correctly ruled in the court below, to the premium for the families introduced by them within the general limits of the country before the declaration of independence.

If they be entitled to any premium except for families to whom titles have been actually issued, or who were admitted as colonists before the closing of the land offices, it is immaterial to the government whether the families actually arrived [22] in the colony or were only within the limits of the country, provided they were introduced through the agency or at the expense of the empresario. The fact of the agency of the empresario is material, and is to be submitted to the determination of the jury.

Having decided that the government is not liable for the losses subsequent to the revolution, occasioned by the abrogation of empresario contracts, and that the plaintiffs on continuing contracts are entitled to the benefits of all entries previous to the date of the declaration of independence, resulting in the actual introduction of families into the country, I proceed now to consider such other questions suggested by the record and the arguments as are deemed material to the decision of the cause.

There is a mass of documents appended to the petition as exhibits, not one of which was established in strictness, in conformity with the rules of evidence. Whether they came from the office of the secretary of the state, or elsewhere, cannot now, from the record, be ascertained. There was a list of exhibits marked A from the office of the secretary of state, which is lost, and we are therefore not informed whether all, or how many, of these were among the number. The

documents in the original language should have been produced or their absence accounted for; if deposited in a public office, the copy of the original, or the translation, should have been authenticated by the official seal of the officer.

The question of the admissibility of most of these documents need not be discussed. Some of them may be said to constitute a part of the public history of the country, and the facts embodied in them in relation to the inception and various changes of this contract have been stated in the official reports of the commissioner of the general land office, and not being of material consequence to the issue, may be admitted as proven.

There are two documents under the official seal of the [23] secretary of state which, though but translations, without any authentication of their correctness, are admissible, as well from the consent of the attorney general in the court below, as from the fact that one is a copy of a decree, No. 285, and the other a contract founded upon the law, and in which there is no material departure from its provisions. This suit was commenced before the establishment of a general land office, and this explains the fact of the documents being deposited with the secretary of state.

The republic admitted on the trial that the petitioner was empresario of the colony. This was not necessary to sustain his claim. The law of 1834 treats the contract as his own, and recognizes no other agent for carrying out the project of colonization. He commenced action shortly after the passage of the law, as empresario, and continued to act as such; the witnesses recognized him as empresario, and his conduct in that capacity is contrasted with that of other like officers. His activity, energy and expenditure in encouraging emigration are authenticated, and he appears to have been unaided by the assistance, pecuniary or otherwise, of others in the establishment of the colony.

The laws and the facts, as proved, show the actual existence of such a contract, and that the petitioner was the empresario. He was treated by the laws and the government as such agent; the duties, responsibilities and obligations of such

agency devolved upon him, and he is entitled, so far as the government is concerned, to the enjoyment of its benefits.

It is true that neither alien empresarios nor their assignees are permitted to bring suits, but the petitioner cannot be regarded as laboring under either disability. He was treated by the former government as empresario of the colony, and has, therefore, the right to sue in that capacity. The contract in this cause, having been treated by the parties and the court below as valid, under the laws of Coahuila and Texas, and as subsisting up to the declaration of independence; [24] and the rights of the parties having been argued very elaborately, on the supposition, at least in the alternative, that such was the character and condition of the contract, we have deemed it advisable to settle the principles by which, in that event, the rights of the parties ought to be adjudicated; and we now proceed to inquire whether this contract did continue to subs'st, in its original validity and force, up to the date of the declaration of independence.

It has been contended in this court, that by decree No. 317 of the laws of Coahuila and Texas, this contract was entirely annulled, and that consequently the petitioner is not entitled to a premium for any families introduced after that date.

This decree is expressed in the following terms:

Art. 1. The resolution spoken of in the decree of the 6th of April, 1834, on the subject proposed by the foreigner, Sterling C. Robertson, should have been understood as properly belonging, as it does, to the judicial power.

Art. 2. In pursuance thereof, any resolution that shall be dictated by any other authority shall be null.

Art. 3. The executive shall provide that the colony be returned to Austin and Williams, respecting, notwithstanding, what is expressed in the foregoing articles, the rights legally acquired by the families introduced by Robertson previous to the expiration of the term of his contract, and those of the families that shall have thus acquired them by virtue of the prolongation of 1834.

We have given the subject the most anxious consideration, with a view, if possible, of avoiding the bar opposed by this

decree to the continuation of the contract, up to the time of its extinction by the revolution, but we have been unable from any views which were offered in argument, or which have suggested themselves to our consideration, to obviate the force of the positive terms of the decree, declaring in effect the nullity of the contract. The documents exhibited by the petitioner show that the resolution referred to was [25] taken by the executive, and not the judicial authority, and this action, by the above decree, is declared to be null.

It is to be regretted that the question of the effect of this decree had not been raised in the court below, as the petitioner might have there shown the nullity of the decree, or the want of publication, or some other defense, which might have neutralized its effect.

But the decree passed without notice in the lower court, and it stands here with the like evidence of authenticity and validity as the other decrees to be found in the collection of the laws of Coahuila and Texas.

If the doctrine contended for by the counsel of the appellee, that he was authorized to act on his contract until the date of the actual devolution of the colony to Austin and Williams, was sound, we would hold it to have been the duty of the republic to show that period of their reacceptance of the contract, or that otherwise the party would be entitled to all the benefits flowing from a contract of unimpeachable validity.

But we are not of opinion that such is the legitimate interpretation of the decree. The contract with Robertson being declared null by the second section, its force is, by the very terms of the act, destroyed, and its further existence or nullity is not made to depend upon the action of the government in returning the colony to Austin and Williams, or their acceptance of the same. Had the executive disregarded the injunction of the law, yet the petitioner could not be benefited by his disobedience, as his rights over the territory could not be regained without the interposition of legislative action in his favor.

It is also contended that this latter decree is retrospective, contrary to the constitution of Coahuila and Texas, and therefore void.

It must be remembered that the power of interpreting the laws and determining their conformity with the constitution was an attribute of the legislative and not of the judicial [26] department of the state of Coahuila and Texas. Article 97 of the constitution declares it to be one of the attributes of congress to "enact, interpret, amend or repeal the laws, relative to the administration and internal government of the state, in all its branches;" and art. 172 is expressed in the following terms, viz.: "The tribunals and courts, being authorized solely to apply the laws, shall never interpret the same nor suspend their execution."

In Spanish jurisprudence, the interpretation of laws is divided into the authentic, the customary and the doctrinal. The authentic is that given by the legislator himself, who alone has the authority to resolve the doubts, and fix the sense of words, and whose decision is obligatory on citizens and tribunals, and must be obeyed both within and without courts of justice. The customary is that given by judges, consulting the spirit of the law, jurisprudence, usages and equity, and has a certain force and authority when two or more decisions made by a superior tribunal on a similar subject matter are in conformity with each other. The doctrinal is the opinions given by jurisconsults and other persons versed in the law. Diccionario de Legislacion, p. 316.

Both in the federal and state governments of Mexico, the power of interpreting the laws by a decision which would be final and conclusive was, in the distribution of powers, vested in the legislative department of the government.

The decree No. 317 being the interpretation, then, of a former act, by the only authority competent to fix conclusively the meaning of the terms, must be regarded as having all the force and effect of a final judgment by an authority having full power and jurisdiction over the subject matter. Such interpretations may not have the permanent force and authority of a judicial sentence in one respect, as they are subject to change or reversal at every succeeding session of the legislature, but until modified or repealed, they stand as conclusive expressions of the sovereign will, from which

there is no appeal, and for the wrongs and injuries which may be thereby inflicted there is no redress.

It is true that the attribute of interpretation is now vested in the judicial authorities of the country; and whether in any case an interpretation given by the congress of Coahuila and Texas, to any of its decrees, would be reviewed and reversed, can be determined when the question arises, and is fully argued. We do not consider this as a proper case for the exercise of such authority, if its existence were undoubted.

The former government always treated these contracts as instruments of public policy, subject to modification, suspension or revocation, at the pleasure or in accordance with the policy of the government.

But apart from the general authority exercised over these projects or agencies for colonization, and were it admitted that the rights of empresarios cannot be legally disturbed, yet these rights are here in conflict, and it is impossible, from the meager facts presented, to determine which, in equity, had the better title to the territorial limits embraced in the contract.

The change of agents or contractors was frequent, and on grounds either not known at all, or so insufficiently shown as to afford no means for determining the rightfulness of the exercise of the power.

The territory was first assigned to Leftwitch in 1825, who afterward disposed of his interest to the Nashville company. Their interests were, in 1827, recognized by the government, and their agent, an inhabitant of the county, was regarded as empresario. After this contract had subsisted for five years, with but little progress toward its completion, it was suspended by the law of the 6th April, 1830, prohibiting the introduction of emigrants from the coterminous countries. In February, 1831, one or two months before the expiration of the contract by its own limitation, and years before the suspensory provision of the 6th April, 1830 was repealed, [28] the same territory was ceded to Austin and Williams for the purpose of colonization.

Three years subsequently, this contract with Austin and

Williams was annulled, and the term of the Nashville colonial contract was, in 1834, prolonged for four years, of which contract the petitioner then became the empresario, and about twelve months afterwards, by decree No. 317, above cited, this prolongation was also annulled, and the colony was again devolved upon Austin and Williams.

These transmutations bear more resemblance to the processes of legerdemain than to the proceedings under a wise and stable administration of the law, or to the uniformity which should characterize legislation. But they were all done by the competent authorities of the country; the grounds of their procedure are in a great measure unknown, and whatever may be the extent of our remedial jurisdiction, where all the facts are presented, yet the case, as it appears on this record, is not one for the legitimate exercise of such authority. We do not feel it a duty imposed upon us to determine whether any, and which of these contradictory acts is unconstitutional.

It is our province more especially to decide upon the effect and not the legitimacy of the legislative acts of the former authorities of the country.

The question arises, then, as to the time at which the contract with Robertson ceased to exist.

The annulling decree was enacted in May, 1835, and by its terms no date was fixed for its operative force and effect. The date of the publication of the law not being proven, the period of taking effect is a matter of presumption. Since the revolution, the statutes adopted by congress until 1840 were considered to be in force from and immediately after the approval by the executive. In that year there was a general enactment that the acts of congress should not go into operation until forty days after the adjournment of congress, unless where otherwise expressed in the body of the statute.

[29] But under the former governments, it was an undoubted principle that the laws were of no binding obligation until after they were duly promulgated. Vide L. 1 tit., 2 book, 3 Recop. Novisima.

The form of publishing decrees by the executive is pre-

scribed in decree No. 3 of the constituent congress of the state of Coahuila and Texas, p. 6. These decrees were transmitted to the inferior authorities, and by them published in their respective jurisdictions. No question was raised as to the fact of publication in this case. And, without argument, we feel unwilling to lay down positively general rules on the subject of publication, or at what time after the passage of laws they shall be presumed to be in force. It is true that the collection under the title of the "Laws and Decrees of Coahuila and Texas" was published under the authority of the republic, and the presumption should be, that none but laws validated by the customary formalities were inserted in that collection. This presumption is not conclusive, and can be rebutted by satisfactory proof. To hold the contrary doctrine, that the presumption was against the force of the law until after proof of publication, would be to place the former laws of the country on no higher footing than foreign laws, which must be proven as facts, and, after the lapse of a few years, from the impossibility of obtaining such evidence, would, in effect, obliterate their force and efficacy.

We should perceive, then, that the existence of this law, being one published in the compilation, was communicated to the petitioner, but the time is uncertain.

There was no specified period for the promulgation of the laws, nor for their going into operation, in proportion to the distance from the seat of government.

The presumption would generally be in favor of the publication after the lapse of a reasonable time for its transmission from the capital; but from the peculiar circumstances of this case, we do not think that the decree ought to be enforced [30] against the petitioner until the period of closing the land offices.

The decree was not made the subject of discussion in the court below. It was either unknown or regarded as a nullity. The fact of its publication, or of the time at which it was communicated to the petitioner, was not made a matter of controversy. If these facts had been litigated, they could, at that day, have been established by abundant evidence. The ap-

pellant, holding the contract as valid and subsisting up to the declaration of indepencence, and as not affected by this decree, the petitioner could not have deemed it necessary to his interests to establish the time at which he was informed of the law. The evidence shows that he continued through the whole period, up to the closing of the land offices, and afterwards engaged earnestly in accomplishing the objects of his contract.

For these reasons, and for the purpose of avoiding any possible injustice to the petitioner, we have deemed it but equitable to allow him the benefit of his contract, up to the closing of the land offices by the act of the consultation.

The government has also, by its act, approved January 28, 1840, p. 140, vol. 5, Laws, legalized all the deeds issued by the commissioner of the colony to actual settlers, and it is but just that the empresarios, by whose exertions these settlers were introduced, should receive the premium awarded to such labors.

The jury, in their verdict, state that they find evidence of one hundred families having been introduced to Robertson's colony previous to the renewal of his contract; two hundred and seventy-nine families agreeably to the titles issued by Steele, one hundred recorded previous to March, eighteen hundred and thirty-six; and one hundred and twenty-one introduced previous to that time, but not recorded, in consequence of the closing of the land office, making in all six hundred families, for which they find thirty leagues and thirty labors of land. Rejecting the two hundred and twenty-one [31] families introduced after the closing of the land offices, would leave three hundred and seventy-nine families, viz.: the one hundred introduced before the 6th of April, 1830, and the 279 to whom titles were issued. No question has been made as to whether the first hundred should or should not be included with the 279 who received titles from Steele. It has not been contested by the state, and we will therefore not investigate the point.

An objection was taken at the trial to the name of any single man found in the list of titles being counted in favor of the petitioner. This was sustained, and we think correctly, to a

certain extent. If the twelfth article of the colonization law were construed literally, no premium could be awarded except for the introduction of families; but we think that in equity they are entitled to a reasonable proportion for the introduction and establishment of single men. Having no positive rule to guide our discretion, we are of opinion that for every three titles issued to single men the empresario is equitably entitled to the premium allowed for one to a head of a family. Of the two hundred and seventy-nine titles issued by Steele, there were one hundred and eight for six and one-quarter labors, and less. According to the prescribed proportion, the premium for these would be the amount allowed for the settlement of thirty-six families, reducing one hundred and eight from two hundred and seventy-nine, and adding thirty-six to the remainder, would make the sum of two hundred and seven, the whole of the families being three hundred and seven, for which the appellee is entitled to his premium lands. By the twelfth article of the colonization laws the empresario is not entitled to a premium for any fraction of families introduced less than one hundred. This provision should not be construed rigorously, and should only be made applicable in cases where the contract continued throughout its full term, uninterrupted by acts of legislation or changes of government. The empresario is therefore entitled to the premium for the fraction of seven families.

[32] The petitioner does not set forth the titles issued to the appellee as empresario, nor ask for their confirmation. Nor are they exhibited in the answer of the defendant, with a prayer for the revocation of all or any of them.

The question of the power of the court to confirm or revoke titles already issued to empresarios was not raised by the pleadings or the argument, but from the evidence in the cause, it appears that the deceased intestate had obtained titles to a larger quantity of land than he will be entitled to under our decree; and the question arises whether we shall remand the cause for further proceedings, as the parties may be advised in relation to the confirmation of some and the revocation of others of the titles, according to such rules and principles as

may be in conformity with law, or whether we shall so far lay down these rules and direct the action of the parties that their rights can be ascertained with almost positive certainty, and the duty of the lower court restricted to the confirmation of such action of the appellee as he may take in conformity with the decree of this court.

Under the general authority conferred by the statute, there can be but little doubt of our power to confirm titles issued to empresarios, so far as to divest the state of any right to the lands so granted, or to revoke them, when they are so presented as to become properly a subject matter for final adjudication.

The suits are brought " to settle the claims of empresarios," and this, where titles have previously issued, cannot be done except by determining the lands to which the premium shall attach.

It is important that it should be speedily determined which of these lands belong to the claimant and which to the state; and it is of more especial interest to the claimant, that his rights should be so far adjudicated as not to be necessarily exposed to further harassing and vexatious litigation.

Had an issue been made by the pleadings in relation to the subject matter, or if even there were sufficient evidence, [33] in causes of this character, to enable the court to proceed to a final and absolute, and not a contingent disposition of the controversy, we would at once proceed to declare the lands to which the claimant is entitled and those which are vacant and form a portion of the public domain.

But in consequence of a privilege to which we think the appellee is justly entitled, and which will be accorded to him in the decree, and from the want of sufficient evidence, we find it impossible to finally dispose of the matter in litigation. But we will lay down such rules for the adjustment of the claim, and for the future action of the court below, as will indicate, with a reasonable degree of certainty, to both of the parties, their respective rights in the lands which were deeded by the former government to the empresario.

An examination of the 12th article of the colonization law

will, we think, show very clearly the principles upon which empresarios who have received more lands than their just premium shall proceed in the specification of the lands to which they are actually entitled.

By that article there was granted to every contractor of a new settlement, for each hundred families he might introduce and establish in the state, five sitios of grazing land and five labors, etc. The introduction of the families is plainly indicated as a necessary condition precedent to the grant of the land; and, in contemplation of law, a grant of land could only legally issue after the families were introduced.

The party being entitled then to his premium lands, as a compensation for families he had already introduced and actually established in the state, can rightfully claim only such lands as were granted him on that consideration, and not those granted him in anticipation of his further discharge of the contract.

It results, then, from these principles, founded on the provisions of the law and the stipulations of the contract, that the first fifteen leagues and twenty-three labors for which [34] the deceased received a title were granted for the actual introduction of families, and that the remainder was deeded to him before he had performed the condition on which alone the grant was authorized to issue.

The appellee is then entitled to the fifteen leagues, taken in the order of their dates, which were first issued to the deceased, and to twenty-three labors out of the sixteenth league.

But notwithstanding deeds could not legally issue to the empresario until after the actual introduction of the families, yet on the principles of justice, he was entitled previously to make his selections to be subsequently deeded to him, on the accrual of such right from the progressive performance of the contract; and as there may be a portion of the lands to be recovered by the appellee which are claimed under titles issued previously to those received by the empresario, we shall consider the lands, deeded beyond the sixteenth league, as selections which may, if the appellee shall so choose, be substituted to the extent of the quantum of the land to be confirmed

to him, which is affected by the existence of previous titles. This privilege of substitution cannot be used in cases where the deceased had alienated, sold, or otherwise disposed of a portion of his premium lands, although the same may have been covered by a previously existing title, and this right of substitution is adjudged to the appellee, in analogy to the privilege afforded headright claimants, under the 38th section of the land law of the 14th December, 1837, and must follow the successive order of the titles by their dates, commencing at the title which would be the seventeenth, and progressing continuously until the quantum of land is obtained, equal in amount to the portion of his premium, affected by previously existing titles.

The judgment of the district court is reversed.

And the court here proceeding to render such judgment as the court below should have entered, it is ordered, adjudged [**35**] and decreed that the deceased intestate was entitled to receive for his premium lands titles to fifteen leagues and twenty-three labors of land; that having received titles to a greater amount of leagues and labors than the said number, the appellee is now entitled to the first fifteen leagues, in the consecutive order of the dates at which the titles were issued to the said deceased as empresario, and twenty-three labors out of the sixteenth league, so deeded to the said empresario; and should any of these sixteen leagues be located on lands to which titles have been previously issued by the former government, the appellee is entitled to the extent to which such premium lands may be affected by such previous titles, to substitute, if he should be so advised, out of the leagues deeded to the intestate over and above the first sixteen leagues, an amount of land equal to the quantity of the premium lands so affected by such previously existing titles. This substitution to be permitted only in relation to such of the premium lands, claimed to have been affected by previously existing titles, as were not sold, alienated or otherwise disposed of by the deceased in his lifetime, or by the appellee since his death. And it is further ordered, that this substitution shall take place according to the numerical order of the titles by their dates,

commencing at the title which should be ranked as the seventeenth by its date, and progressing continuously in the successive order of the titles by their dates until a qoantum of land is obtained equal in amount to the portion of the premium land affected by titles previously obtained. And it is further ordered, adjudged and decreed that the appellee do, within three months of this date, file in the office of the clerk of the district court of the county of Travis an abstract of the titles of the fifteen leagues and twenty-three labors to which he is entitled by this decree, to be selected in conformity with its rules and instructions, and if the same be conformable in all respects to the principles and rules by which such selection is directed to be made, the said court is authorized to confirm the said titles to the said appellee, as [**36**] representative of the deceased, so far as to divest the state of all right or claim to the said lands, and the said lands are to be holden on the conditions annexed to the premium lands of empresarios by the colonization law of 24th March, 1825. And if the said selection be not made by the appellee in three months from this date, and duly filed as above required, then the appellee is absolutely restricted to the first fifteen leagues and twenty-three labors granted to the empresario, in the order of their dates.

And it is further ordered, that the lands deeded to the deceased intestate as empresario, and not forming a portion of the fifteen leagues and twenty-three labors adjudged by this decree as the amount of the premium lands to which the intestate was entitled, being vacant lands and forming a portion of the public domain, the appellee is directed to produce in the district court of the county of Travis, at its next term, the titles for the same, that they may be cancelled.

And it is further ordered, that this cause be remanded to the district court for further proceedings, in accordance with the instructions contained in this decree.