Mr. Chief Justice HeMpiiill
delivered the opinion of the court.
The plaintiff in the court below, the appellee in this court, states that his testator, Stephen E. Austin, in his lifetime made three separate contracts with the government of tbe state of Ooaliuila and Texas for tbe settlement, in all, of nine-hundred families in the province of Texas, and within the territorial limits specified in said contract.
His first contract with the state was for the settlement of five hundred families, and was entered into on the fourth *39 day of June, 1825. The term of all the contracts was six years from their date. That prior to the expiration of the term of the first contract the said Austin had introduced and received more than five hundred colonists, and that titles were issued to four hundred and sixty-two settlers. That titles were not issued in many instances for the reason that the colonists had not the means of paying the fees of office; in others, from the death of the colonists and no person having heen appointed to represent them; and because, also, the commissioner, Arciniega, left the colony before he had completed titles to the settlers who had been introduced, and their issue has been since prevented by the revolution.
His second contract was for the introduction of one hundred families, to be settled on the east side of the Colorado river, above the San Antonio road, and was made on the 20th of (November, 1827. It is alleged that more families than were required by the contract were introduced, but that titles were issued to sixty-one only for the reasons above set forth, and for the additional one that before the expiration of the contract the empresario was employed in the public service, being sent by the convention of 1883 upon an embassy to Mexico, from which he did not return until after the expiration of the contract.
That the empresai’io, having consummated his part of the contract, is entitled to thirty leagues and thirty labors 'of land; that he received as part of his said premium lands, fifteen leagues and fifteen labors, and that he had selected and caused to be surveyed, as a part of the balance of his premium lands, nine leagues and ten labors, the field notes of ten leagues of land being exhibited as the lands selected, and that he is further entitled to six leagues and five labors of land, which have not been selected.
The petitioner further states that on the 29th day of July, 1S25 (it should be 1828), the said Austin made another contract with the government of the state, with the approbation and ratification of the general government of Mexico, for the introduction of three hundred families within the ten coast leagues, between the La Baca and San Jacinto rivers; *40 that he had introduced into the said colony two hundred and seventy-nine emigrants and settlers and that more than three hundred were received, and that the whole contract would have been completed, but for the reasons already stated. That of the fifteen leagues and fifteen labors to which he is entitled on this contract, he has received titles for ten, and has located and selected three leagues and five labors, as a part of his remaining premium, and that two leagues have not been selected.
The petitioner prayed for an injunction, restraining the commissioner of the general land office fx-om issuing titles to other persons, for the lands claimed and desci-ibed in the petition.
And that the county surveyors of the counties where the land lies be prohibited from surveying or interfering with said lands and that a good and sufficient title for the said lands be made to the said petitionei1, or that he obtain judgment for the value of the same.
The injunction was granted.
It was proven that the certified copies of the contracts, which had been delivered to Austin for his security, were deposited by him in the general land office.
The translations were certified to be eoiTect by the official translator, and that the instruments exhibited were copies of the translations was certified by the commissioner.
Evidence was taken as to the compliance by Austin, with the conditions of the contracts.
Mr. Williams, in his depositions, states, that there were more families admitted by Austin, under his conti’acts, than wei’e sufficient to have completed the numerical number which he was authorized to settle; that no separate record was kept for families introduced under each conti’act, their namés were put down in a book and they chose for themselves the position which best pleased them, and that the register and applications will show the number i*eceived, and that the reason why the titles were not all completed was, that those entitled to lands neglected to attend to their business; that he does not know of any titles having been issued to persons after they had left *41 the country; many persons made selections and never returned to the country, but got no titles; that there always existed a strange desire to forfeit lands, and if any person who had obtained a title left the country, there were always persons wanting to have the same declared forfeited. That the great portion of all the titles issued were made to persons who emigrated to Texas of their own accord. After being in Texas they contracted with S. F. Austin for the benefits of the colonization law and incorporated themselves by asking for admission into the colonies he was authorized to settle. The book or abstract of land titles, the original register of applications and admissions in the several contracts, as well as said abstracts, were read in evidence. They were not transcribed, but were agreed to be read in this court. They were not, however, produced.
The jury found that the plaintiff had complied with his contract. They confirmed to him the land titled and that selected, and found him entitled to ten leagues more, worth twenty-five cents per acre. By the judgment of the court, the finding of the jury was confirmed and it was adjudged that the plaintiff should have and recover of the state of Texas, the lands selected and surveyed and also ten more leagues of land, or the sum of eleven thousand and seventy dollars, the value thereof.
The statutory provisions relating to empresario contracts, and authorizing suits to be brought to settle the claims of empres-arios, are found in sections 5th, 6th, 7th, 8th and 9th, of the “ act supplementary to an act, to establish a general land office, for the republic of Texas,” 1 vol. Laws, p. 263. And the 5th, Sth and 9th of which sections were substantially or almost literally reenacted in the 26th, 27th and 28th sections of the act to reduce into one act, and to amend the several acts relating to the establishment of a general land office, passed December 14, 1837.
The sections 26 and 27 of the latter law, upon which this suit is founded, are expressed as follows: “It is hereby declared that all empresario contracts having ceased on the day of the declaration of independence, all the vacant lands of *42 Texas are tbe property of this republic and subject alone to the disposition of the government of the same.
“Section 27. That in order to settle the claims of empresa-rios each and every one of the same are hereby authorized to institute a suit against the president of the republic of Texas, which suit or suits shall be tried in the county in which is situated the seat of government, and shall be tided as all other land suits are required to be tried; 'and should any empresario who should sue, fail to establish the claim for which he sues, he shall pay all the costs of said suit; provided, that neither aliens nor the assignees of aliens shall be entitled to the benefits of this act.”
There were two exceptions taken on the trial to the charge of the judge, the last of which, as it goes in effect to the jurisdiction of the court, will be first considered.
The charge was that if the jury believed the plaintiff’s testator had done everything on his part necessary to be done to carry out his contract, and that the government of Coahuila and Texas had failed to appoint the facilities necessary to their completion, he was entitled to recover as though said contracts had been entirely completed.
If we admit that the government of Coahuila and Texas was under an obligation to award the whole premium to the empresario, the correctness of the proposition would depend on the facts whether this government has assumed the discharge of such obligation; and if it has, whether the courts of the country have jurisdiction over the subject matter.
We enter upon this inquiry without any aid derived from the argument'or research of counsel, as none have been made in the cause, except a short brief from the counsel of the appellee referring to his argument in the case of the empresario, Eobertson.
The argument of counsel in-that cause, though distinguished for profound and extensive investigations on the rights of empresarios to compensation when obstructed in the performance of their contracts by the acts of the present government, do not embrace the question of the political obligation of the *43 present government to discharge claims existing against the former for acts which obstructed the completion of his contract.
The solution of the question depends on the construction •of the sections above quoted, from the land law of December 14, 1837.
It might be plausibly urged that authority to sue the gov-eminent is conferred only upon the empresarios, whose contracts had not expired before the declaration of independence.
The 26th section declares that all empresario contracts having ceased on the day of the declaration of independence, all the vacant lands of Texas became the property of the republic.
This declaration is inapplicable to contracts which had expired previously, as had all the contracts sued upon in this case; and as the next section authorizes empresarios to sue for the settlement of their claims, it might be objected that this authorization extended only to empresarios whose contracts had been abrogated by the declaration of independence, and not to those whose contracts terminated during the existence of the former government. That the legislature was willing to respond in such damages as had been occasioned by any act of the existing sovereignty, and as would be awarded on the principles of justice and of the laws of nations, but that they had not intended, when adopting these provisions, to incur any responsibility for the acts or omissions of the former governments.
This construction could not be stigmatized as illiberal, for the intention of the legislature is enveloped in such obscurity that the above or the opposite construction might be plausibly and forcibly maintained.
But as the government has not distinctly indicated, or refused to acknowledge or mature the claims of empresarios against the former government, and as each and every of the empresarios are authorized, for the settlement of their claims, to bring suit, without specifying the government against which the claim originated, and where, as in this case, the consideration of the obligation accrues to the benefit of the *44 present government by furnishing population, contributing, as they did, most efficiently to the accomplishment of the revolution itself, we are of opinion that we do but justice to the-enlightened and liberal views of the government, by entertaining jurisdiction of such claims as are made in this case, and deciding them according to the principles of equity, the stipulations of the contracts and the provisions of law under which such contracts were made.
We proceed now to a decision of the cause, without any reference to the rule in the statute that the claim should be tried as all other land suits are required to be tried.
This, as a rule, is too obscure and indefinite to furnish a certain guide for our action.
It is scarcely susceptible of construction, and seems rather an expletive phrase to complete the sentence than a rule for the decision of the vast interests involved in these controversies.
In a former case we have determined on the principles and rules by which we will be governed in the adjudication of empresario claims.
In proof of the claim alleged in the petition, the abstract of titles and original register of admissions, as colonists, were read on the trial, and by agreement were to have been read in this court.
They have, however, not been presented, and I have-on the present occasion examined to some extent these documents in the land office, but in future, parties must produce, where the books are read below, transcripts of the same in this court, or certificates authenticated from the commissioner, of the facts which they establish.
It was proven by a witness that more than the numerical-number of families sufficient to complete all the contracts had been admitted .as colonists, and reference was made to the, register of applications in proof of the fact.
The books of admissions exhibited at the land office do not afford very satisfactory evidence on the subject. It is probable some of the records were wanting, as the first application which is noted is in May, 1829, some years after the making of the first contract.
*45 Tbe books in tbe office furnish evidence of the registration of about tbe numerical number of applicants only, viz.: nine hundred, necessary to complete the number of families to be-admitted in the contract.
We have no proof of the number of titles issued to colonists, but it is alleged in the petition that titles were issued to four hundred and sixty-two settlers in the first contract, and a specified number in each of the others. The first contract was for five hundred families, and expired in June, 1831, and as the commissioner remained in the colony until 1832, and on his departure left a number of blank titles, I can see no sufficient reason why this contract was not completed.
There was no separate register kept for the several colonial contracts, and it is impossible to compute with certainty the number of families registered for this particular contract, and if even the precise number of admissions were shown, yet the mere registration of an application does not afford evidence of the final establishment of the emigrant in the colony, as it is in proof that many persons, after making their selections, left the country and never returned.
The number of titles issued under this contract should then, under tbe circumstances, be presumed to be the number actually introduced by the empresario, unless rebutted by positive and circumstantial proof of the residence of families or colonists not included in the number who had received their titles.
There was no proof as to the respective numbers of families and single men, which, in the aggregate, constituted seven hundred and five settlers under all the contracts in this suit. This evidence ought to have been adduced on the part of the plaintiff in the court below. The answer admits nothing, and leaves the plaintiff to make out his case. In the case of K.ob-ertson, empresario, the proportion between the classes of grantees was easily ascertained by reference to the abstract of titles.
But the abstract of titles issued in Austin’s colonies embraces, in one undistinguishable mass, all the titles issued under bis original contract for tbe settlement of three hundred fam *46 ilies — which is not included in this suit — those issued on the contracts in the record, together with those issuing in Austin and "Williams’ colony, and augmentations and special grants.
It would be a laborious task to separate from this mass, the titles issued under the firstj or all of the contracts in this suit, and ascertain, with precision, the number of single men to whom titles were issued. This should have been done at .the trial, but the parties, the jury, and the court below, acted on the presumption that the grantees were all families; nor has the fact been questioned in this court.
Under such circumstances, the cause might well be remanded, that the facts might be more definitely ascertained, but the litigation has been protracted, and its termination is to be desired, and we believe that an equitable rule of proportion can be adopted, which, though not precisely correct, will so nearly accord with the facts, as to do no injustice to the parties, at least to the appellee.
In the case of the empresario, Robertson, of the whole number of two hundred and seventy-nine titles, one hundred and eight were for a less quantity than a league, being considerably more than one-third of the whole number.
Prom the examination of the abstract of titles issued, as well under Austin’s first contract with the state government, as under the others embraced in this suit, it would seem that the deeds made to single men may be fairly computed at one-third of the whole number. Establishing this as a just proportion between the two classes of grantees, and admitting the allegations of the petition as proven, that there had been issued respectively, in each contract, the number of titles averred, and which, in the aggregate, amount to seven hundred and five; there would, out of this number, be two hundred and thirty-five titles, for a less quantity than a league. Estimating three of these titles as equivalent to one issued to a family, the whole number of titles issued to families would, on computation, amount to about five hundred and fifty; the premium for the settlement of this number of families being twenty-eight leagues and thirteen labors of land.
Having determined on the number of families to be claimed *47 by the empresario, as having received their titles, the question arises as to the amount of premium to be awarded for families alleged to have been admitted, but who, for causes stated in the petition, did not receive their titles. We have before decided that there is no foundation for the claim, so far as it is grounded on families alleged to have been introduced within the first contract before its expiration, but to whom titles of possession were not issued.
The commissioner was not only present in the colony until the contract ceased by its own limitation, but for a year after-wards, and even acted after his departure, by leaving blank titles to be issued on application. It was the duty of the empresario, to have presented the whole number of five hundred families to the commissioner, before the 4th June, 1831, on which day the contracts became extinct, under the penalty of losing the privileges offered, in proportion to the number of families, he failed to introduce. These families should have possessed such requisites as would insure a compliance with the spirit and policy of the colonization law. They should have been willing to select lands, and possess sufficient means to pay the very small amount of office fees and government dues required by the provisions of the decree. Art. 8, Col. Law, 1825. Under the circumstances, the rational conclusion is that titles were issued to all who remained within the limits of the first contract, and that the rights of the empresario in this contract are coextensive only with the number of these titles.
Nor are we of opinion that the claim can be maintained in its full extent, as to the other contracts, frqm the proof presented in the record. A specified number of titles was issued in each of these contracts, and it is claimed that families sufficient for their completion were admitted by the empresario.
As there was no separate register for the several colonies, it is impossible to estimate with precision the number of admissions in each. If that were the case, there is no-evidence as to the number of registered applicants who domiciliated themselves in the colony or country, while the fact is stated that many after selecting lands, abandoned the country and never returned.
*48 The colonists were not introduced at the expense or through the agency of the empresario, and could not, therefore, from such circumstances, feel under any special obligation to remain in his colony; but as they consulted only their own inclinations and interests in applying for admission, so as these changed they might remove elsewhere without just cause of complaint on the part of the empresario.
The whole of the proof does not raise such a presumption of the continued residence of the applicants, as could only have been rebutted by proof to the contrary.
The colonists introduced themselves into the country, applied for admission where they pleased, and many of them abandoned the colony or country afterwards at will without asking or receiving titles for lands; and, under such circumstances, the claimant ought to have shown who received titles and who on the list of applicants had not received them, but continued to reside in the country for the purpose of procuring titles from a duly appointed commissioner.
The principal ground upon which the whole premium is claimed on the two last contracts is, that there was no commissioner in one, for about one year before its expiration, and, in the other, that Col. Austin, acting both as empresario and as commissioner, was employed in the public service of Texas eighteen months before the termination of the contract.
It seems that during this whole period applications for admissions were registered, and it is alleged that on the part of the empresario the contracts were completed. But had the embarrassments of the empresario been represented to the government of the state of Coahuila and Texas, and a commissioner been appointed to issue titles as well to the colonists as to the empresario, it is very improbable that any other premium lands would have been allowed, except for the families whom the commissioner would find established in the colony ready to receive their titles.
There being no evidence in the record from which we can ascertain the precise number of families who were actually domiciled in Austin’s colonies, and believing, as we do, that a portion of the settlers in the contracts had not, from the cir *49 cumstances above stated, obtained their titles of possession, we are compelled either to remand the cause or adopt some equitable rule for the adjustment of the claim and the termination of the controversy.
We shall adopt the latter course, and from the rule we shall apply it is believed that, if the whole matter were to be reinvestigated, the result would not vary materially from that which will be actually attained under our decision; and, as it is very expedient that the ordinary business of courts of justice should not be longer impeded by this litigation, which has been already so long protracted, we will hold, for the purpose of speedily adjusting this claim on principles of justice, that had the government afforded all the necessary facilities for the completion of these last contracts, they would have been fulfilled to the same extent as was the first contract under the like circumstances. There can be no pretense of the want of government facilities for the settlement of the whole number of families required by the first contract, as the commissioner not only remained until the contract was extinguished, but for a year afterwards employed in the execution of titles. Yet, notwithstanding this state of facts, there were, instead of five hundred families being settled in the colony, but four hundred and sixty-two titles issued, including, as well, those made to single as to married men. We do the most ample justice to the appellee by holding that if he had been undisturbed he would have approached as nearly to the completion of the two last contracts as he did that of the first, where there was no obstruction, and even extraordinary facilities afforded for its completion.
On this supposition, then, that he would, if unobstructed, have performed his engagements on the two last contracts to the same extent that he complied with the first, he is entitled to compute thirty titles on the second and eighty-eight on the third, more than were really issued, amounting to one hundred and eighteen titles, and equivalent to one hundred titles issued to heads of families. The five leagues and five labors additional premium for these families, added to the other premium lands amount in the aggregate to thirty-three leagues *50 and eighteen labors of land. Of these, titles were issued to twenty-five leagues and twenty-five labors, leaving seven leagues and eight labors, which he is entitled to recover from the state.
It will be seen that this controversy has been adjudicated on what would, in ordinary trials, and under other circumstances, be deemed insufficient proof. It is believed, however, that the justice of the case has been attained, and that if the facts were established by the fullest proof, the result would not be materially variant.
The deficiency of proof has been owing to the novelty of the causes, the illimitable ocean of controversy on which the parties and courts were thrown by the legislature, almost without rudder or compass to guide them, and to the entire want of prescribed rules as to the facts to be proven, the character of claims to be recognized, the questions to be examined, or the doctrines and principles of law by which the rights of parties should be adjusted.
But, in future causes of this character, plaintiff's must allege in their pleadings the number of titles which had been already issued to them for premium lands, and prove the fact by authenticated certificates from the land office.
If the empresario has not already received his quantum of premium lands, and claims more on the ground of titles having issued, for which no premium, has been received, the number of these titles must be proven, discriminating between those issued to single and those to married men.
If he claims for families who have not received titles, in consequence of the want of a commissioner, or from some similar act of omission on the part of the former government, the fact of the families remaining in his colony, or in the country until the declaration of independence, must be established.
The construction of the statute which authorizes the recovery by the empresario, on the ground that he was obstructed by the acts of the former government in the completion of this contract, is not free from doubt, and must be limited to cases where, to a certain extent, the present government derived some benefits from the efforts of the empresario. Hone ac- *51 ci’ued from applicants who left the country before the revolution. They would not themselves have been entitled to lands unless they had remained, not only up to the declaration of independence, but until they had made application for their certificates under the land law of December 14,1837, and we think an empresario cannnot complain if required to prove that they remained until the declaration, and especially where the proof is, that the colonists emigrated of their own accord and at their own expense, without the agency or the assistance, pecuniary or otherwise, of the empresario.
"Where lands have been selected and surveyed for the premium, but titles were not issued by the former government, the surveys must be proven to have been made in conformity with the then existing law of colonization. To procure a patent for a survey of a headright, made before the closing of the land offices, it must be sworn to by the surveyor; be proven by at least two respectable witnesses, and be shown to be in conformity with law in all respects.
These directions should be pursued by the empresarios, in the establishment of their surveys. Their claims stand, at least, on no higher footing than those made for headlights.
As a general rule, the plaintiff claiming lands from the government must allege and fully prove all the facts necessary to support his claim. Ho presumption is to be raised as against the government, who is a stranger to all the matters and things alleged in the petition, not judicially within the knowledge of the court, and who, if she does not controvert, cannot admit the truth of the averments of the claimant.
In this case, there are field notes for ten leagues of land annexed as exhibits to the petition; all of them intrinsically defective in not stating the quality of the land surveyed —• some of them not signed by a surveyor, and others wanting a line; and one without definite location — none of them sworn to nor proven by witnesses, nor shown 'to be in conformity with law.
The surveyor of most of these tracts of land was a witness at the trial, and yet his evidence was not taken as to the surveys. As no objection was made by the state, in the court *52-53 below, to the correctness of the field notes, and as the court and jury acted on the presumption that they were admitted, and their correctness has not been questioned in this court, we will not remand the_ cause for the adduction of proof on this point.
To produce full proof is the duty of the plaintiff, but where he introduces the field notes without objection or exception on the part of the state, thus leaving the court and jury to act on the presumption of their entire correctness, the plaintiff is thrown off his guard; and when they are not questioned in this court and we have no reason to consider them as fictitious or forged, or otherwise suspicious, the cause will not, on such ground, be remanded.
We have decided on the new points presented in this cause with reluctance, as we were without aid from the arguments of counsel, either orally or by brief; there being none made or filed in this cause, excepting a very short brief filed by the counsel of appellee.
The cases of empresarios’ claims will not hereafter be decided, involving as they do such vast interests and important principles, without full argument from the parties, or at least from the one which proceeds, ex forte, in the prosecution of the appeal.
The question presents itself as to the proper judgment to be entered in this cause. We have decided in the case of the empresario Iiobertson, that where titles have been issued to an empresario for more land than he is found to be entitled to, on the adjustment of his claim, he shall be allowed to select out of the lands so deeded, an amount sufficient to satisfy his claim, commencing with the first title issued and continuing in the consecutive order of their dates until the quantum allowed for the premium is obtained. This rule of adjustment is founded upon the provisions of the 12th section of the colonization law of the 21th March, 1825, allowing lands by clear intendment to empresarios only on condition precedent of the introduction of families; and, consequently, the titles first issued, until the full amount of premium which has been decreed is obtained, are, in contemplation of law, *54 granted after the performance of the precedent condition, and the others in anticipation of the further discharge of the contract, and regarded as full titles, would be invalid and without the authority of law. The correctness of the principle by which, as a general rule the empresario would be restricted to the titles first issued, is recognized, but there might be cir-■cumstancs and equities which, to some extent, would induce its modification, and which can be determined when they arise 'for consideration. In the case of the empresario Robertson, we have determined that if any of the deeds, included in the premium lands decreed to the empresario, conflict with older titles, the empresario shall, if he choose, have the privilege of .-substituting a portion of the lands deeded to him, beyond the •amount of premium to which he was entitled.
In the case before the court, the plaintiff prays that a good and sufficient title be made to him for a specified number of leagues and labors of land; the field notes of ten of which leagues are annexed to the petition as exhibits, and the locations of others are sufficiently indicated by their calls, to be distinguished from other private or public lands. The surveys are all within the limits of the first contract, and the locations, some labors excepted, are within the third or coast •colony.
By the judgment, the plaintiff recovered nine of the ten “leagues for which the field notes of the surveys were exhibited; •all of the leagues indicated by selections, and sixteen labors lo•cated but not surveyed. Out of these lands the appellee will be, by our decree, entitled to seven leagues and eight labors of land. Were the surveys and locations dated, and were there but one contract, the appellee, according to the rule referred to, would be restricted to the first seven leagues and eight labors, in the order of the dates of the locations and surveys; but they are without dates, and situated in the different colonial ■contracts. Having no other rule, we will, after ascertaining the number he is entitled to in each contract, so far as this is possible from the imperfect facts in the record, give judgment for the lands in the numerical order in which they .are exhibited in the record, until the seven leagues are com *55 pleted; and tbe eight labors will be selected from the sixteen for which he has obtained judgment in the lower court.
On the third contract, or coast colony, the testator in his lifetime had received titles for ten leagues and ten labors, and the appellee has, in this suit, recovered judgment for three leagues and eight labors, selected in said colony, but not surveyed. The number of families which would have been introduced into this colony, had the empresario been undisturbed in his efforts to complete its settlement, being two hundred and ten, according to the rules on which the claim has been adjusted, the ten leagues and ten labors which were deeded to the testator, in his lifetime, were all that he was entitled to' receive, and, consequently, no portion of the premium to be decreed can be selected out of the three leagues and five labors-for which judgment was rendered, and which are situated within the limits of this colony.
The first and second contracts, generally hnown as the old and little colonies, are consolidated in the petition, at least so-far as the claims of the empresario are involved, so that it is impossible to ascertain how many of the fifteen leagues and fifteen labors, deeded to the empresario, were taken in the first, and how many in the second contract. Of the surveys claimed, there is but one within the limits of the second contract, the other nine leagues being within the first; and as we are not apprised of the respective number of titles deeded to the empresario, in either of the contracts, we cannot positively determine whether his premium should include the single survey located in the little colony, or whether it should be composed entirely of surveys made in the first contract.
The facts being uncertain, and the more probable presumption being that he is entitled to a proportionable share of his premium out of each of the contracts, we will, in the decree, award the survey for the league in the little colony; the other six being composed of that number in the first contract,, in the order in which they are exhibited in the petition, the eight labors being selected from the eleven located near San Pelipe.
*56 The judgment of the district court is reversed, and the court here proceeding to render such judgment as should have been entered in the court below, it is ordered, adjudged and decreed, that the appellee, as executor of Stephen E. Austin, deceased, do have and recover, for the balance of the premium lands to which the deceased was entitled on the contracts embraced in this suit, the following described lands, according to the surveys of the same appended as exhibits to the petition, viz.: one league of land south of Jesse Grimes, and east of Fulton; two leagues of land on the east side of the river Brazos and on the Navosoto, known on the plot as leagues Nos. 9 and 10, south and adjoining lands of Moses Bane and G. H. Coleman; three leagues of land on the east side of Davidson’s creek, known on the plot as Nos. 8, 9 and 10, and which, when connected with No. 11 claimed in the petition, but not granted in this decree, are described in the petition as bounded on the east by John Bird, James Perry and James Foster; on the south by Samuel Swearingen, the field-notes of the said leagues being numbered in the list of exhibits as 1, 2, 3, 4, 5, 6. One league of land situated on the east bank of the Colorado river, above and adjoining the town tract of the town of Bastrop; a tract of land, supposed to contain four or five labors, situated on the east side of the Brazos river, below San Felipe de Austin, bounded on the north by Johnson Hunter’s labor, on the east by Spring or Irons’ creek, on the south by the Brazos river, and on the west by labors Nos. 9 and 21; and also four other labors situated above the town of San Felipe, on the west side of the Brazos, known on the plot of labors as Nos. 4, 8,11 and 16. For a more full and perfect description of the said lands, reference is made to the field-notes filed as exhibits to the said petition, and which will be copied at length in our judgment on the minutes. And all the title of the state of Texas to the said lands is divested out of said state and vested in the appellee, as executor of the said Stephen F. Austin, deceased, to be held by said appellee, as executor as aforesaid, on the conditions prescribed by the colonization law of 24th March, 1825; and the injunction heretofore granted, so far as it restrained all persons from en *57 tering or surveying any of the lands described in this decree, and the commissioner of the general land office from issuing patents on the same, is hereby made perpetual; and so far as the said injunction embraced and affected other lands, the same is hereby dissolved.
And it is further ordered that all the locations and surveys confirmed by the judgment of the court below, but not allowed in this decree, be and the same are hereby declared void, and the lands embraced therein, vacant and belonging to the public domain.