## ROBERT ROSE V. THE GOVERNOR.
## THE SAME V. THE SAME.

The assignees of empresarios, who were aliens to the republic of Texas, are not entitled to the benefits of the 27th section of the Act of December 14th, 1837, authorizing the institution of suits to settle the claims of empresarios.

The proviso of that section, was intended to be sweeping, and to cut off from the benefits of the act, all persons who were not citizens of the republic. It meant to exclude both alien empresarios, alien assignees of citizen empresarios, and assignees of alien empresarios, even though such assignees were citizens of the republic.

That proviso referred to persons, in the relations which they then bore to the government, and not merely to those who might be aliens at the time of the institution of their suit.

There is no authority conferred by the State of Texas, for the institution of a suit against herself, or the governor, to settle the claims of empresarios, or for the recovery of their premium lands, by persons embraced within the meaning of the 27th section of the Act of 1837; and therefore such suit cannot be maintained.

The right to sue the governor, or the State, is matter of favor, conferred by the State, in derogation of that immunity which every sovereign enjoys; and statutes conferring such privileges are to be construed with strictness, so as to extend the right only to those by whom it was clearly intended that it should be enjoyed.

APPEAL from Travis. Tried below before the Hon. Alexander W. Terrell.

This suit was brought by Robert Rose, a citizen of Galveston, Texas, for the use of Stephen Whiting, John Haggerty, and George Griswold, against the Governor of the State of Texas, for the adjudication to him, for the use aforesaid, of twenty leagues and twenty labors, as the premium lands to which Joseph Vehlein was entitled as an empresario, by virtue of two contracts made by him, with the authorities of the state of Coahuila and Texas.

The first contract, made the 21st of December, 1826, by Vehlein, required him to introduce three hundred families, as settlers and colonists, into the state of Coahuila and Texas, within certain

boundaries or limits, within six years; and by another con-
tract, made between the same parties on the 17th of November,
1828, he was to settle and colonize one hundred more families,
within the time above prescribed.

A decree, No. 192, of the Congress of the state of Coahuila
and Texas, gave to Vehlein an extension of three years, to com-
ply with his contracts. It was proved on the trial, that there
had been issued by the commissioner, for Vehlein's colonies, three
hundred leagues and six fractional parts of leagues to families,
and fifty-five titles to unmarried persons; and that neither Veh-
lein, nor any one else, had received the premium lands, to which
he was entitled, for introducing, colonizing, and settling such
families and single men, in the said colonies.

The petition alleged, as a reason for failing to obtain the said
premium lands, the closing of the land office, by the Consultation,
previous to the expiration of the term to which his contracts
were extended, as aforesaid. The petition alleged, that Veh-
lein, and those acting with him in carrying out the contracts,
did comply with the said Vehlein's part, by introducing and
settling upon the lands designated, four hundred families; and
thereby the said Vehlein became entitled to receive twenty
leagues and twenty labors of land, as premium lands.

The plaintiff further alleged, that Vehlein, after making the
contracts, finding himself unable from his own resources to ad-
vance the necessary pecuniary means and labor, to carry out
the said enterprise of colonization unaided, engaged the assist-
ance and services of certain persons, who were represented by
the said Whiting, Haggerty, and Griswold, to carry out and
perform all the obligations in completing and fulfilling the
stipulations of Vehlein's contracts, and for which he stipulated
they should receive all the benefits resulting from the same,
which would have accrued to Vehlein, for the performance of the
said duties and obligations. The plaintiffs alleged, that the said
persons did perform all of the said duties, and were entitled to
the benefits resulting from the said contracts.

The contract referred to, was entered into by Zavala, Burnet,

and Vehlein, (all of whom had colony contracts,) with Anthony Dey, W. H. Sumner, George Curtis, and Jose Antonio Mexia, on the 16th of October, 1830, to form a company to carry out the contracts previously obtained by the three first named parties, making the profits of the contract the common property of the shareholders of the said company, and appointing Dey, Sumner, and Curtis, trustees of the company. The organization was designated as the "Galveston Bay and Texas Land Company."

In pursuance of the articles of association, a deed of trust was made the same day, (October 16th, 1830,) and a power of attorney was executed by Zavala, Vehlein, and Burnet, to Sumner, Dey, and Curtis, with power to carry out the provisions of the articles of association, as the trustees thereof, and to sell and dispose of all lands received, and to receive them from the government in their own names, and with power to substitute, and make sub-agents.

On the 6th day of April, 1831, Dey, Curtis, and Sumner, by deed, substituted John T. Mason in their stead. In November, 1833, Zavala and Vehlein, by their respective deeds, confirmed the substitution of Mason, and gave him power to name substitutes, who might likewise choose other substitutes.

In October, 1843, Mason substituted Robert Rose. In April, 1848, Stephen Whitney, John Haggerty, and George Griswold, the supervising directors of the company, formed by the original articles of association, designated as the "Galveston Bay and Texas Land Company," confirmed Rose's powers, and gave him power to sue in his own name, for the premium lands due to the company.

Anthony Dey, George Curtis, and William Sumner, intervened in the suit, alleging, that the two former were citizens of the state of New York, and Sumner of Massachusetts, and that they were members of the "Galveston Bay and Texas Land Company;" that the deed to them was executed for the benefit of Whitney, Haggerty, and Griswold, who were, and still continued to be, the directors of the said company, and prayed, in the event

HARVARD
LAW SCHOOL
LIBRARY

of the want of sufficient legal title in Rose to recover of the State the said lands, that they might recover the same, in virtue of the rights of the said Vehlein, as trustees of the said Whitney, Haggerty, and Griswold.

The plaintiffs introduced in evidence the deeds, contracts, and powers of attorney referred to, and proved such compliance with the contract, as was alleged, by the records from the land office, showing that there had been issued by the commissioner of the colony, the number of leagues stated in the petition, to families and single men; and proved, that neither Vehlein, nor any one for him, had received any premium lands, for introducing, colonizing, and settling the said families and single men, in the colony.

The defendants proved, that Dey, Sumner, Curtis, and the directory, Whitney, Griswold, and Haggerty, were citizens of the states of New York and Massachusetts, at the date of the contracts with them by Zavala, Vehlein, and Burnet, and had so remained up to the trial of the case.

The parties waived a jury, and submitted the case to the court, and judgment was rendered for the defendant. The plaintiff and intervenors, who took their appeal, assigned for error: 1st. The judgment of the court refusing the relief prayed for, in the plaintiff's and intervenors' petition, or so much, as was warranted by the facts proved. 2d. The court erred in rendering judgment for the defendant, on the answer alleging the former alienage of the trustees of the empresario Vehlein, or his assignees.

The opinion in this case applies to another case, between the same parties; the facts in each were substantially the same, except that the plaintiff and intervenors in the other, sued in right of the empresario contract of Zavala, under whom they claimed, by the same state of facts, as presented in this case. Both suits were filed on the 16th day of December, 1857.

*J. A. & R. Green*, for the appellants.—The facts of this case are the same as in the case of The State v. Burnett, 9 Texas Rep.

48, with the exception, that in this case it is admitted that Dey, Sumner, Curtis, Haggerty, Griswold, and Whitney, were aliens to the republic of Texas, until after annexation, and are still citizens of New York and Massachusetts. Unless the action be defeated on that ground, the plaintiffs or intervenors are entitled to recover under the case above cited.

The decision of this case depends upon the construction to be given to Art. 1821, 2159, Hart. Dig. Art. 1821, after providing for the institution of suits by empresarios, against the President, for their premium lands, proceeds as follows: "provided, that neither aliens, nor the assignees of aliens, shall be entitled to the benefit of this act."

We think it very clear, (notwithstanding an apparent intimation to the contrary, in The State v. Burnett, before cited,) that the "aliens," referred to by the act, are *not those who were aliens when the act was passed, but those who should be aliens when the suit against the State was instituted.*

1. It must be supposed, that the principal object of the restriction upon aliens, was to carry out the spirit of the constitutional inhibition, by which aliens were prevented from holding lands. This object would be better subserved by the latter interpretation of the act. Under it, no person could sue under the law, and recover his lands, until he became a citizen, and if he abandoned his citizenship for that of a foreign country, he would cease to be entitled to the benefit of the act. Otherwise, he might abandon his citizenship, resume some previous foreign allegiance, sue for, recover, and hold large grants of land, merely because he was a citizen of Texas at the exact time when the act was passed. This would directly contravene the words and policy of the statute.

2. It may have been a secondary object in the restriction to preserve the sovereignty of the Republic, by disallowing citizens of a foreign government, over whom they had no control, and in whom they had no interest, to sue the State. If so, the construction we contend for, would also subserve that object.

3. This construction also accords with the spirit of the then

existing laws, and exemplifies the rule, that statutes *in pari materia*, should be construed together. It allows the alien empresario, desirous of securing his just claims against the State, to do so by becoming a citizen thereof. This accords with the design and scope of the various statutes in force, granting lands to aliens who would make Texas their home. It is also strictly in analogy with the constitutional provision, allowing alien heirs a reasonable time to become citizens, and take possession of their otherwise forfeited lands. On the other hand, the interpretation sought by the counsel for appellee, ill accords with the policy of the decisions rejecting the headright claims of parties, who, *having every other qualification*, lacked that of residence, *at the time of applying for the headright*. (The State v. Casinova, 1 Texas Rep. 401; Linn v. The State, 2 Id. 317.)

4. The language of the act naturally bears this meaning. It does not read, parties "*who are now* aliens, shall not be entitled," &c., but simply " aliens shall not be entitled to the benefit of this act," thereby referring the *status* of the person claimed to be an alien, to the time when he seeks the benefit of the act. No one contends that it was meant by the Constitution, when it ordained that " no alien shall hold land in Texas," that these words referred the alienage of the party to the time when the Constitution was adopted; but the question would be, is the party an alien at the time when suit is brought against him by the State for an escheat.

5. It is also a maxim of interpretation, that remedial laws shall be liberally construed. The act in question confers no rights, but merely gives a remedy. It is the duty of the court, therefore, to extend the remedy by all reasonable intendments. Instead of that, this court is asked to interpret the restriction liberally, and the remedy strictly.

*Attorney-General*, and *Oldham & White*, for the appellee.

BELL, J.—There are only two questions presented by the record and in the argument of counsel. These questions prac-

tically resolve themselves into one, for they both concern the right of the plaintiffs to maintain this action. The first inquiry is, what is the proper construction to be given, in this case, to the 27th section of the Act of December 14th, 1837, entitled, "An act to reduce into one act, and to amend the several acts relating to the establishment of a General Land Office." The 27th section of the act reads as follows:

"That in order to settle the claims of empresarios, each and every one of the same are hereby authorized to institute a suit against the president of the republic of Texas, which suit or suits, shall be tried in the county in which is situated the seat of government, and shall be tried as all other land suits are required to be tried. And should any empresario, who should thus sue, fail to establish the claim for which he sues, he shall pay all the costs of said suit; provided, that neither aliens, nor the assignees of aliens, shall be entitled to the benefits of this act."

It is, perhaps, worthy of remark, that this 27th section of the Act of December, 1837, is but a re-enactment of an act of June 12th, of the same year, entitled, "An act supplementary to an act entitled, 'An act to establish a General Land Office for the republic of Texas,' passed December 22d, 1836." The re-enactment of this provision, as a part of the general act reducing into one, and amending the several acts relating to the establishment of the land office, shows, that the subject was one of importance, and gives weight to the presumption, which exists in all cases, that the legislative body maturely considered the matter before them. The subject was, indeed, one of very great importance. The land system of the Republic was about to be put into operation. The contracts of the empresarios were declared to have expired on the day of the Declaration of Independence. All the vacant lands had become the property of the Republic. The war of the revolution had not terminated, and the public lands were regarded by all, as constituting the resource from which means were to be obtained to sustain the independent government that had been established.

Under these circumstances, we must suppose, that the claims of the empresarios were well known to the Congress of the republic, and that the legislation on the subject was founded upon the fullest investigation. The empresarios were but few in number; they were all known. It was known that Zavala and Vehlein were empresarios. It was matter of history that "The Galveston Bay and Texas Land Company," having its directory in the state of New York, then a foreign state to the Republic of Texas, asserted large pretensions growing out of contracts with the empresarios Burnet, Vehlein, and Zavala.

Bearing these facts in mind, it may also be worth while to remark, in this connexion, that the proviso of the statute, which has been quoted, does not have exclusive reference to empresarios themselves, because the assignees, of whom the proviso speaks, could not be empresarios. An empresario, as the term is used in our land laws, was one who contracted directly with the government.

And I am of opinion, that the word "aliens" used in the proviso, was not intended to refer only to empresarios who were aliens. I think the proviso was intended to be sweeping, and to cut off from the benefits of the act, all persons who were not citizens of the republic. It would have been contrary to the policy of the government, to have permitted an alien assignee of a citizen empresario, to have recovered and held large bodies of land in the republic. I think the proviso was enacted in view of all the facts as they existed; and that it meant to exclude from the benefits of the act, both alien empresarios, alien assignees of citizen empresarios, and assignees of alien empresarios, even though such assignees were citizens of the republic.

It is argued, with much ingenuity, by the appellant's counsel, that the proviso only intended to exclude from the benefits of the act, those who might be aliens at the time of the institution of their suits. We do not think the position is tenable, as will be understood from what has already been said. The contracts of the empresarios were all past transactions. The statute did not contemplate, that empresario contracts would be afterwards

made, to which the government of the republic would be a party. It was intended only to provide for a state of things which then existed, and which then pressed upon the attention of the government; and we think that the proviso referred to persons in the relations which they then bore to the government.

These views make it unnecessary for us to discuss, at any length, the remaining point in the case. But upon that point also, we think the judgment of the court below must stand. The point is, that these appellants are not qualified to maintain this suit against the Governor of the State of Texas, because they never had capacity to maintain a suit against the President of the Republic of Texas. The Act of April 25th, 1846, provides, "that in all cases in which parties were authorized by the laws, to commence suit against the President of the Republic of Texas, or against the Republic, prior to the adoption of the State Constitution, such parties may now commence such suits against the Governor or against the State of Texas." It is contended by the counsel for the appellee, that these appellants, being aliens to the Republic of Texas, were never authorized by the laws, to commence suit against the President of the Republic, or against the Republic; and that they are not therefore such parties as may commence suit against the Governor, under the provision of the Act of the 25th of April, 1846.

We think the position is a sound one. The right to sue the Governor, or the State, is matter of favor conferred by the State, in derogation of that immunity which every sovereignty enjoys; and we think, that statutes conferring such privileges should be construed with strictness, so as to extend the right only to those by whom it was clearly intended that it should be enjoyed. There can be no question at all that these appellants were not entitled to sue the President of the Republic of Texas, or the Republic of Texas. They were aliens to the Republic, as is shown by the evidence. If they had instituted their suits, at any time during the existence of the Republic of Texas, they would clearly have been within the operation of the proviso of the 27th section of the Act of December 14th, 1837. Not having had capacity

to sue the President of the Republic, or the Republic, they cannot now sue the Governor of the State, or the State. The judgment of the court below is affirmed.

Judgment affirmed.