JAMES POWER v. THE STATE.

1. LACHES PLEADED IN BEHALF OF THE STATE.—In an action brought
   February 22, 1873, under an act of December 14, 1837, authorizing
   suits against the State to settle the claims of empresarios: *Held*, that
   a demurrer was properly sustained, on the ground of laches in the
   prosecution of such claim.
2. LIMITATION MAY BE PLEADED BY THE ATTORNEY GENERAL.—It
   seems that the Attorney General may properly interpose *limitation*
   as a plea when the State is sued, even in cases where suit is allowed
   for the purpose of ascertaining the amount and validity of such
   claim.

APPEAL from Travis.  Tried below before the Hon. J.
P. Richardson.

This is a suit against the Governor of the State to re-
cover sixteen leagues of land certificates claimed by the
plaintiffs as heirs of James Power, deceased.

Plaintiffs allege that they are heirs of Power; that Power
and Hewitson were empresarios of a colony in Coahuila
and Texas, and made a lawful contract for and settled said
colony; that the State of Coahuila and Texas, by legislative
act, granted to said Power and Hewitson eight leagues of
land each, as an indemnity to them for losses sustained in
settling said colony; that a concession was issued for the
same by the executive of the State in 1834, and the com-
missioner of the colony ordered to put them in possession;
that, by reason of the revolution of 1836, and because the
lands first applied for proved not to be vacant, they never
received possession of any lands under said grant and con-
cession; that Hewitson conveyed his interest in said grant
to Power in 1835, and that said grant and concession now
constitute a valid, subsisting, unsatisfied claim for land
against the State.

Petitioners also allege that their ancestor, James Power,
the original grantee of the claim, died August 15, 1852,
leaving a will, by which he provided that his entire estate

should be kept in the hands of the executor until the youngest child should become of lawful age, and should then be divided equally amongst his widow and children; and they allege that one of the petitioners, Agnes Power, is a minor at the time of filing this suit, and therefore sues by her mother, as her next friend and natural guardian.

The suit was filed January 22, 1872. The Governor of the State was cited as defendant, and the Attorney General appeared for the defense and excepted to the petition by exceptions, and afterwards demurred, and referred to the exceptions as grounds of demurrer. The demurrer was sustained by the court, and judgment rendered for the defendant.

From this judgment plaintiffs appeal, and assign as error the sustaining of the demurrer in each and every exception.

*Hancock & West* and *Moore & Shelley*, for appellants.

The different constitutional provisions and acts of the Republic and laws of the State, by virtue of which this suit is instituted, need not be set out at length, as to do so would take up too much space. It will therefore, we trust, be deemed sufficient for us to make the citations clearly and fully.

The constitutional provisions in reference to the subject are the following: Plan of Provisional Government, Art. XIV, Pas. Dig., vol. 1, p. 27; Plan of Prov. Govt., Art. XV, Pas. Dig., vol. 1, p. 27; Const. of the Republic, Schedule, sec. 1, Pas. Dig., vol. 1, p. 35; Const. of the Republic, General Provisions, sec. 10, Pas. Dig., vol. 1, p. 37; Const. of the State, [1846,] Art. VII, secs. 20, 21, Pas. Dig., vol. 1, p. 65; Const. of the State, [1846,] Art. XI, secs. 1, 2, Pas. Dig., p. 71; Const. of the State, [1846,] Art. XIII, sec. 3, Pas. Dig., p. 72; Const. of 1870, Art. XII, sec. 33, Pas. Dig., vol. 2, p. 1130.

The laws of Coahuila and Texas on the subject are the

following: Colonization Law of 1825, Laws of Coah. and Tex., p. 20; Pas. Dig., vol. 1, p. 212, *et seq.;* Decree No. 253, Laws of Coah. and Tex., p. 230, (being the decree providing for the issuance of sixteen leagues of land to Power and Hewitson;) Decree No. 13, Laws of Coah. and Tex., p. 76; Decree No. 75, Laws of Coah. and Tex., p. 113.

The acts of the Congress of the Republic of Texas bearing on the case are the following: General Land Law of 1837; Laws of the Republic, vol. 2, p. 62, secs. 11, 12, 13, 17, 24, and 26; and also Pas. Dig., arts. 795, 796, 797, 798, 799.

The statutes of the State on the same point are as follows: Pas. Dig., arts. 801, 802, 803.

The cases in which these laws have been cited and construed by our courts are the following: Houston *v.* Robertson, 2 Tex., 14; Houston *v.* Perry, 3 Tex., 395; Houston *v.* Perry, 5 Tex., 462; Herndon *v.* Robertson, 15 Tex., 594; State *v.* Burnett, 9 Tex., 51; Rose *v.* The Governor, 24 Tex., 502; Donaldson *v.* Dodd, 12 Tex., 387; McMullen *v.* Hodge, 5 Tex., 34; Blair *v.* Odin, 3 Tex., 288; Kilpatrick *v.* Sisneros, 23 Tex., 125; Trevino *v.* Fernandez, 13 Tex., 630; Trimble *v.* Smithers, 1 Tex., 790; Jennings *v.* DeCordova, 20 Tex., 513; Warren *v.* Shuman, 5 Tex., 441; Lewis *v.* Mixon, 11 Tex., 568; Wallace *v.* The State, 33 Tex., 445; Thompson *v.* The State, 31 Tex., 166; Grant *v.* Chambers, 34 Tex., 573; Bissell *v.* Haynes, 9 Tex., 559.

As the case is somewhat out of the *antiqua via legis,* and rests upon a few statutes, we have deemed it best to group all the authorities on the case at bar which we regarded as material, and, without any further reference to them, we will content ourselves with a few observations on the rights of the appellants to a judgment in their favor in this case on the facts stated.

These facts are all admitted, and, as disclosed in the record, may be stated thus:

On the 11th of June, 1828, by virtue of the colonization

laws of 1825, (Pas. Dig., art. 563, *et seq.*,) Power and Hew-itson made a colonization contract with the Government of Coahuila and Texas for the introduction into Texas of a large number of families to be located between the Lavacca .and Nueces rivers.

The boundaries of these old colonies and their limits are matters of public history, and the courts can judicially notice them. (Martin *v.* Parker, 26 Tex., 257; Ledyard *v.* Brown, 27 Tex., 403.) In Pas. Dig., arts. 257 and 258, the boundaries of this particular *empresa* will be found set forth, and in Bissell *v.* Haynes, 9 Tex., 560, a full and inter-esting account of the colonial enterprises of Power and Hewitson will be found.

By the colonization law of 1825, under which this con-tract was made, the empresario was entitled to receive five leagues and labors of land for every one hundred families introduced.

It appears, however, from the record that, owing to the . difficulties which beset the path of these empresarios, it became exceedingly doubtful whether or not they would be able to comply with the terms of their contract. In view of this they made application to the Legislature of Coahuila and Texas for relief, and, as the result, Decree No. 253, rendered February 3, 1834, above cited, was passed. By the provisions of this, Power and Hewitson were to have eight sitios of land each as an indemnifica-tion for the expense they had incurred under their contract.

It further appears from the record that in 1834 Power and Hewitson had only been able to introduce a portion of the families, falling far short.of their original expectations. The Government of Coahuila and Texas then took action and gave them a concession for sixteen sitios of land, which they attempted to locate near the ancient Mission of Goliad. But the lands proved to be appropriated territory, and hence no benefit resulted to them from the conces-sion, and when, in 1835 and 1836, the revolution effected

a change of Government, it found these empresarios in the same condition as the empresarios Stephen F. Austin, S. M. Williams, (see Perry *v.* Houston,) Sterling C. Robertson, (see Houston *v.* Robertson,) David G. Burnet, (see State *v.* Burnet,) Vehlein, and Zavalla. (See Rose *v.* Governor.)

They had performed, in a great measure, the work they had contracted to do, but the Government with whom they had contracted had been overthrown and destroyed, in fact, by the very men whom these empresarios had introduced.

Their claim, then, was nothing more than an imperfect, inchoate right. It had no standing in the courts of the new republic which had sprung up from the ashes of its predecessor. It could unquestionably have been disregarded. The claim had no legal character. It was simply a sort of imperfect moral obligation that rested on the Republic, inasmuch as the new Government had reaped all the reward that had followed from the expense incurred, and the hardships endured by the empresarios, in introducing their colonists. In short, it was nothing more nor less than a charge upon the conscience of the body politic, which it could respect or disregard at its own will and pleasure. To the credit of the Republic and of the State, they did not disregard this charge, but by the constitutional and statutory provisions above cited, converted that which was but a moral obligation into a legal and binding obligation. In short, they practically placed the empresarios and their colonists on the same footing. And as they had, by the act of 1836 and 1837, (Pas. Dig., art. 4129,) made provision for the issuance of first-class head-right certificates to those colonists to whom the empresarios had not granted land prior to the closing of the land offices by the decree of the consultation, (see Decrees of the Consultation, Pas. Dig., vol. 1, p. 27,) so by the same law, all the empresarios who had not received from the former Government their quantum of premium lands, were authorized to receive them

under the laws of the Republic and of the State. But with this difference, however, that while a limitation was fixed by the different acts within which the colonists should apply, no time was fixed by the acts allowing empresarios to sue. (See 5 Tex., 462; 11 Tex., 568.) There was good reason, too, for this distinction. The number of colonists was large; there were many opportunities for fraud; the mode of obtaining their head-rights was simple and unexpensive; the time given was long, and hence there was no need to keep it open. As to the empresarios, the mode of establishing their rights was much more difficult and expensive, and involved delay; the number of empresarios was small; they could be counted on one's fingers; their rights of transfer. to aliens were cut off; and, under the circumstances, the Government practically declared that so long as such a claim existed its courts should be open to the assertion of their claims.

The facts of the case being undisputed, the only question is, Are the laws giving the empresarios the right to sue still in force? That they were in force up to 1861, no one doubts. (Pas. Dig., art. 803; The State *v.* Burnett, 9 Tex., 52; Rose *v.* The Governor, 24 Tex., 502; Grant *v.* Chambers, 34 Tex., 574.) They were not obsolete or repealed up to that time. That they are not repealed or annulled by the Constitution of 1870 is also certain, unless it be held that the provisions of that Constitution repealed all existing laws.

But the language of Art. XII, sec. 33, shows what legislation was declared null and void, and all laws not coming within that class remain in full force. Such, too, has been the uniform construction of the courts. (Wallace *v.* The State, 33 Tex., 445; Thompson *v.* The State, 31 Tex., 169; Luter *v.* Hunter, 30 Tex. 704.)

Inasmuch, then, as the acts themselves (Pas. Dig., arts. 799, 803) do not fix any limitation for the bringing of these suits against the State, we believe that it is beyond the

power of the court to take upon themselves to fix a period
of limitations to these actions. (See Rose *v.* The Governor,
24 Tex., 502.) Our Supreme Court say, speaking of this
act: "The right to sue the State is a matter of favor con-
ferred by the State, in derogation of that immunity from
suit that every sovereign enjoys."

It would have been perfectly competent for the State to
have fixed a limitation to these suits, but it did not do so,
nor do we think that it was the intention or policy of the
Government to fix such limitation; and for this court to do
so would not only be judicial legislation on its part, but
would also affix an imputation upon the State of pleading
the statute of limitations to a just claim, when it had given
no one authority to put in any such odious special defense
in its behalf.

The action of the former political authorities, as evi-
denced by Decree No. 253, in adjusting the amount due,
renders any proof on that point wholly unnecessary. It
was equivalent to fixing a certain for an uncertain amount
of land. It was to that extent a change in the contract of
Power and Hewitson, and dispensed with any proof on
their part of any performance of their contract; changed
their unliquidated demand against the Government into a
liquidated and ascertained demand, and prevented these
empresarios from claiming any larger amount from the
Government.

The facts, then, being admitted, and the number of
sitios to which the appellants are entitled ascertained, this
court has before it all the evidence necessary to enable it
to render such final decree as the court below should have
rendered in this case; and under art. 801 of Paschal's Di-
gest, which authorizes the clerk of the Supreme Court to
issue the certificates for the land, it is competent and proper,
under the circumstances, for this court to order its clerk to
issue to the appellants the proper number of league certifi-
cates.

*George Clark, Attorney General,* for the State.

*Peeler & Fisher,* also for the State.

GOULD, ASSOCIATE JUSTICE.—In so far as the petition sets up a cause of action, under an assignment from James Hewitson, who is described as "late of the Republic of Mexico," and who is alleged to have sold his interest to James Power in August, 1835, we think it shows a claim by assignees of an alien empresario, and cannot be maintained. The act of December 14, 1837, under which the suit is brought, is as follows:

"That, in order to settle the claims of empresarios, each and every one of the same are hereby authorized to institute a suit against the President of the Republic of Texas, which suit or suits shall be tried in the county in which is situated the seat of Government, and shall be tried as other land suits are required to be tried. And should any empresario who should thus sue fail to establish the claim for which he sues, he shall pay all the cost of said suit: *Provided,* That neither aliens nor the assignees of aliens shall be entitled to the benefits of this act."

In Rose *v.* The Governor, 24 Tex., 503, this court held that this proviso "meant to exclude from the benefits of this act both alien empresarios, alien assignees of citizen empresarios, and assignees of alien empresarios, even though such assignees were citizens of the Republic." As to the eight leagues claimed under an assignment from Hewitson, we think the demurrer to the petition well taken.

Were it necessary to do so to dispose of the case, we should be inclined to hold that the act just recited was not intended to authorize suits such as this. That act was construed as referring to the courts the ascertainment of the facts showing how far the empresarios, up to the dec· laration of independence, had complied with their contracts, and the adjudication of the equitable rights of the

empresario arising from such compliance. (See Houston *v.* Robertson, 2 Tex., 1, and Houston *v.* Perry, 2 Tex., 37.)

In the former case, C. J. Hemphill, in discussing the question whether empresarios were only entitled to premium bonds for colonists to whom titles had issued, or colonists who had been received and admitted as such, says:

"Had this been the amount of compensation to be awarded, it could, without incumbering the dockets of the courts, have been ascertained by a slight investigation in the General Land Office." (Page 21.) It may well be doubted whether the "claims of empresarios," on which suit is authorized by the act, include a claim to a bounty or indemnity granted to empresarios, which, if valid, was not dependent on the extent to which the empresarios had approximated compliance with that contract.

But we think the demurrer to the petition was properly sustained, on the ground of the laches of plaintiffs and their ancestor in the prosecution of their claim. Over fourteen years elapsed after the passage of the law authorizing suit before the death of James Power, sr., and after that event more than twenty years additional before the institution of this suit. No excuse whatever is alleged for the failure to sue in the lifetime of James Power, sr.; and the only excuse alleged for the delay after his death is that his will provided that his estate should be kept together until his youngest child became of age; and it appears that at the institution of this suit one of the heirs was still a minor. It would seem to be a legitimate inference from this averment that the title had been represented by an executor, or administrator with the will annexed, who might have prosecuted the suit.

We do not think the act of December 14, 1837, was intended to exempt parties instituting suits under it from the ordinary laws of limitation. On the contrary, the law seems to have in view the prompt settlement of such

claims. By the act of April 25, 1846, it was provided, "That in all cases in which parties were authorized by the law to commence suit against the President of the Republic of Texas, or against the Republic, prior to the adoption of the State Constitution, such parties may now commence suit against the Governor or against the State of Texas." (Pas. Dig., art. 803.) Whilst this latter act has been held to include suits by empresarios, under the act of 1837, it is to be observed that it does not specify such suits, nor does there appear any intention to do more than to authorize those who have valid causes of action to establish them by suit against the Governor. No intention to affect the law of limitation can fairly be inferred.

We think no sufficient excuse is shown for the great delay in the prosecution of this claim, and that, even if the act of 1846 were held to cure the delay up to that time, the lapse of twenty-seven years after that date before filing this suit is fatal to the case, according to the most liberal rules on that subject recognized in this court.

The judgment is affirmed.

AFFIRMED.

[Justice Moore did not sit in this case.]